## ATTORNEY GENERAL v. THE BOARD OF COUNCILMEN OF THE CITY OF DETROIT.

*Constitutional law—Perpetuity of institutions—Elective franchise—Tests for holding office—Delegation of powers.*

1. The fundamental and necessary characteristics of the various classes of municipal bodies which administer local government in Michigan, cannot be changed by legislation from what they were as fixed by usage and recognition when the Constitution was adopted.

2. The elective franchise is substantially the same in all parts of the State and cannot be essentially changed in any locality by legislation to regulate the mode of exercising it.

3. Matters of individual conscience, including opinions on political subjects, cannot affect a citizen in any of his legal and political rights.

4. The ballot is a constitutional method of voting and cannot be changed; and its perpetuation is meant to secure the right to vote without having the voter's opinion of men or measures inquired into.

5. Act 320 of 1885 in providing for the appointment of election inspectors in Detroit by a board appointed by the mayor and council, and consisting of two persons from each of the two leading political parties, is unconstitutional: (1) as making particular political opinions a condition to holding office; (2) for sub-delegating the popular power of choosing officers; (3) for interfering with the municipal right to local self-government.

6. The phrase "office or public trust" in the constitutional prohibition against tests includes every important function of government, and covers boards of registration commissioners. And the term "test" does not apply to those special qualifications that are required for particular offices.

7. All officers and functionaries exercising powers of government and control over political action must derive their powers and office either from the people directly or from the agents or representatives of the people.

Mandamus.    Submitted Oct. 6.    Denied Oct. 14.

*Edwin F. Conely* and *Isaac Marston* for relator.

*Fred A. Baker* and *Ashley Pond* for respondents.

CAMPBELL, J. The Attorney General applies for a mandamus to compel the respondents to take action upon certain nominations made by the mayor of Detroit of four persons, two being Republicans and two being Democrats, to act as a "Board of Commissioners of Registration and Election" for the city of Detroit. Respondents refused to consider the nominations because they regarded the statute which provides for such board as unconstitutional and invalid. To an order to show cause they interpose that ground of defense No other question is of much importance in the case.

The necessity of an immediate decision, in order to allow time for the action of the city authorities in season for the coming election, made it impossible for the Court to do more than announce its determination, on rendering judgment in favor of respondents, as any oral statement in brief form of the grounds of their action would have been liable to some misapprehension. It was therefore thought best that the members of the Court should express their views more formally in writing.

The statute in question purports to amend chapter 2 and some sections of chapter 3 of the charter of Detroit, as revised in 1883. Chapter 2, which refers to registration of voters, is entirely superseded by the present act, as is also so much of chapter 3 as provided for the choice of inspectors of election. The new statute undertakes to provide a Board of Commissioners to appoint ward registers and inspectors who are to perform the duties formerly imposed on the boards made up of aldermen and their appointees and of persons elected by the voters. The board thus provided for is required to be composed of four members holding office for four years, the first board being appointed for one, two, three and four years respectively, so that one vacancy shall be filled each year. They are all to be resident electors of the city, and "two members thereof to be from each of the two leading political parties in the said city." They are required two weeks before the time fixed by law for the meeting of boards for the registration of voters, to appoint two qualified electors of each voting district, one "from each of

two leading political parties in said city" to act as registrars and form a district board of registration. The various district boards sitting together are to constitute a city board of registration. The Board of Commissioners are to fill any district vacancies by persons of the same political party to which the absentee belongs.

The commissioners are also required to appoint for each voting district two inspectors, one from each of the two political parties "represented in the common council of said city," the electors choosing a third. Vacancies in any board of inspectors are to be filled by viva voce vote of the electors, but each vacancy must be filled by a person of the same political party as the absentee. The commissioners also appoint the various clerks of election, but have no immediate part in the work of registration by action or supervision.

The statute makes a number of new provisions upon the subject of registration and election, which were more or less discussed on the argument, but which would only be important if the law were not held to be entirely invalid, as we deem it to be. These several provisions will not, therefore, be dwelt upon.

The invalidity of the statute was chiefly based on the argument, upon the illegality of creating a board with such powers as those conferred by the statute, and required to be composed of equal numbers of two political parties appointed as such members and ineligible without such party connection. Relator insists that the Legislature under its power to pass laws " to preserve the purity of elections and guard against abuses of the elective franchise" has discretionary power over the methods, and that even if the partisan qualification is improper the court may treat it as not essential and sustain the commission by allowing the selection of its members without any such test. Neither of these grounds is tenable in our view of the Constitution.

In order to appreciate the bearing of the considerations presented on the case, it will be necessary to make some reference to the general elective system of the Constitution itself.

It is needless to explain that under that instrument the whole scheme of government, in every department, depends upon the action of the qualified voters in their election districts. All male citizens of lawful age, and some whose United States citizenship is incomplete, are entitled after a certain term of residence to vote in the township, or ward, in which they reside. Every vote, for any purpose whatever, is required to be cast in such township or ward. The only exception is in case of soldiers in the field during war. All legislation imposing restraints or conditions upon voting must conform to the other clauses and provisions of the Constitution. No part of that instrument can be allowed to over-ride or destroy any other part. It is also well settled that our State polity recognizes and perpetuates local government through various classes of municipal bodies whose essential character must be respected, as fixed by usage and recognition when the Constitution was adopted. And any legislation, for any purpose, which disregards any of the fundamental and essential requisites of such bodies, has always been regarded as invalid and unconstitutional. There is nothing in the Constitution which permits the Legislature, under the desire to purify elections, to impose any conditions which will destroy or seriously impede the enjoyment of the elective franchise. And as the right of voting is the same everywhere, it is obvious that the conditions regulating the manner of exercising it must be the same in substance everywhere. The machinery of government differs in its details in cities, villages and townships, and of course it is unavoidable that there must be some differences in methods and officers, to administer the election laws. But it cannot be lawful to create substantial or serious differences in the fundamental rights of citizens in different localities, in the exercise of their voting franchises.

It is also a most important principle under our constitutional system, that no one shall be affected in any of his legal and political rights by reason of his opinions on political subjects or other matters of individual conscience. The political right to freedom of belief and expression is asserted in the most distinct way, and applies to every privilege which the

Constitution confers.   No one has ever supposed that any new condition could be added to those which the Constitution has imposed on the right of suffrage, beyond such as are necessary to guard against double voting, or to prevent its exercise by those who are not legal voters.   The only legitimate object of registration laws is to secure a correct list of actually qualified voters.   Any attempt to inquire into the sentiments of voters is not only an abuse, but one which it is the chief purpose of the ballot system to prevent.   The ballot is a constitutional method which cannot be changed, and its perpetuation means the security to vote without any inquisition into the voter's opinion of men or measures.   And it would be entirely meaningless if the voter's choice of candidates for any office must be made from any particular party or number of parties.   But the Constitution has made this more specific (although this was hardly necessary), by providing, after giving the form of an official oath, that "no other oath, declaration or test shall be required as a qualification for any office or public trust."

It is manifest that every important function of government comes under one or the other of these heads of office or public trust.   The board of registration commissioners consists, under this statute, of persons holding permanent offices.   The district registrars, clerks and inspectors perform functions connected with the most vital and important action of citizens in their capacity as choosers of the officers of government.   The constitutional rule covers them all, literally as well as impliedly.

It was urged on the argument that if the term *test* can be held applicable to inquiries into party affiliation, it is equally applicable to those other qualifications often required for public service, such as education, scientific acquirements in surveyors and other specialists, legal knowledge in law officers, and the like.   But this is not so.   Not only is it evident from the other provisions in this clause that all of the exemptions referred to are such as would be applicable in all sorts of offices, but the use of the word *test* is especially significant because its recognized legal meaning in our constitutions is

derived from the English Test Acts, all of which related to matters of opinion, and most of them to religious opinion. Such has been the general understanding of the framers of constitutions. If this were not so, and if the power of the Legislature in imposing conditions of office is at the same time only restrained by express clauses applying in terms to officers and to no one else, it would not be difficult for any dominant party controlling the Legislature to perpetuate its power until overthrown by revolution. But such discriminations are as repugnant to the rights of voters in selecting as to the rights of those chosen in assuming office, and this clause is but an additional assertion of a principle found in other parts of the Constitution, expressed or clearly implied.

In the case of *People v. Hurlbut* 24 Mich. 44, it was not disputed by any of the judges who referred to the matter, that it would not be lawful to confine the choice of officers to particular parties, although two of the judges thought that the provision in that particular case was capable of being eliminated from the statute. And it is claimed in the present case that the present law is declared and intended to be non-partisan, and that the board may be chosen without reference to this restriction of party membership.

It is altogether likely that the framers of the law were of opinion that the evils of partisan action and the temptation to carry it to abusive extremes would be lessened by requiring that one party should not monopolize the offices but that two should share them. No one can doubt the advantage of impartiality in public action. But parties, however powerful and unavoidable they may be, and however inseparable from popular government, are not and cannot be recognized as having any legal authority as such. The law cannot regulate or fix their numbers, or compel or encourage adherence to them. Many good citizens form no permanent party ties, and when elections are close the effort of each party is to detach votes from the friends of the other. Where there are two parties larger than any others, the success of either is very often gained by coalition with a third one. In local matters party allegiance is not uncommonly laid aside for the

time being, so that it cannot be said that any party is represented in the election.    However well meant such a statute as that before us may be, it distinctly makes party adhesion a condition of office, and not only so, but it puts all but the two favored parties beyond the possibility of representation, if the law is obeyed.

It is equally clear that this party representation is the essential purpose of the law, and that the other changes are merely subsidiary.    There are some changes in detail, but the main purpose cannot be mistaken.    The partisan qualifications are made emphatic in regard to all the offices.    It is impossible for any candid person to read the act and believe that the real legislative design can be carried out by leaving the mayor and councilmen at liberty to choose commissioners from a single party, or for the commissioners to appoint registrars and inspectors without distinction of party at their pleasure.    And it would need no great sagacity to see that if such unlimited power were vested in a body made up as this body might then be constituted, all of the old evils would remain, and would be made worse by the absence of any responsibility to the voters of the precincts.

In my judgment the creation of a board with such powers as are given to this board is quite as serious an infringement of the Constitution as the partisan clauses, and much more dangerous.    This board is made by the statute the repository of some of the most important powers of government.    It has the entire control, directly or indirectly, of the elections on which all the departments of government depend. It has the appointment of officers who can deprive any man of his vote at an election, if they see fit to do so, without any adequate means of redress to save it.    While it is unavoidable that a voter's rights at an election must, in case of dispute, be disposed of summarily, it is all the more necessary that the tribunal which decides on so sacred a right should be made up in harmony with representative and popular institutions.

While boards are not uncommonly created for the more convenient managements of the business interests of municipalities, it is a principle universally settled in our

system that all officers and functionaries exercising powers of government and control over political action must derive their powers and office either from the people directly, or from the agents or representatives of the people. The officers of towns and cities have always been so created. The discre- tion of a political body or functionary cannot be delegated and sub-delegated indefinitely. Here the choice of ward officers is made, not by the people of the ward, nor by any one chosen by the people of the ward, nor by the chosen officers of the city, but by persons who are themselves appointees of a part of the city government. No doubt there are many ministerial powers which can be deputized. But a governing body cannot deputize others to perform its governing functions, and the Legislature cannot authorize it to do so without destroying the character of the corporation which is required to be preserved. It has always been held in this State that the municipalities which can be created by our Legislature must be such in substantial character as they have been heretofore known. Up to this time, and ever since elections were first held in Michigan, they have been not only localized in some municipal division, but regarded as municipal action and supervised and managed by munici- pal officers either directly elected or else appointed by those who have been elected. Such a board as this, which is in no sense a mere agency of the city, is foreign to our system. If it can be created in a city, it may be just as well created in a county, or for the State. When the election ceases to be a municipal procedure, the whole foundation of municipal government drops out. And a municipality which is not managed by its own officers is not such a one as our Con- stitution recognizes.

As the defects which have led to a refusal of a mandamus in this case invalidate the whole law, there is no occasion to consider anything else. In my opinion either of them is fatal.

CHAMPLIN and SHERWOOD, JJ. concurred.

MORSE, C. J., concurring. The ostensible primary object of the law under consideration was to preserve the purity of

elections and throw additional safeguards around the ballot-box.  Such a law should be sustained, unless in plain violation of the letter or spirit of the Constitution.  Every good citizen, regardless of political belief or party action, ought to and does desire that the right of suffrage shall be amply protected against hindrance or obstruction to the legal voter, as well as against the fraudulent exercise of the elective franchise.  The security and permanency of good government also depend upon it.  We can take judicial knowledge, I think, that political corruption exists, and that there has been, and is liable to be, a dishonest depositing and an unfair counting of ballots.  There is no doubt but legislation is needed to protect and purify the exercise of this, one of the highest privileges of the citizen.

The constitutionality of this act, which is in the form of an amendment to the charter of the city of Detroit, was attacked upon the argument in this Court upon four grounds, namely:

*First.* That it is in conflict with the provision of the Constitution that " No law shall embrace more than one object, which shall be expressed in its title."

*Second.* That it violates another provision of the Constitution, to wit: " No law shall be revised, altered, or amended, by reference to its title only; but the act revised, and the section or sections of the act altered or amended, shall be re-enacted and published at length."

*Third.* The form of registration prescribed is not in harmony with the constitutional qualifications of electors in this State.

*Fourth.* The Act is wholly void because of the political tests or qualifications of the registration and inspection officers.

I am not satisfied that the first two objections are tenable.

As to the third objection, while I believe the form prescribed not applicable to our election laws, and one that would do more harm than good, creating confusion instead of certainty, and having a tendency to hamper and perhaps to prevent the exercise of the elective privilege by the legal

voter in certain cases, and therefore unconstitutional; yet, under the rule uniformly applied to statutes, it would not defeat the operation of the remainder of the law, as I regard the form of registration rather as an incident to than as the main principle of the Act.

The fourth objection to the law, it seems to me, is fatal. The Act provides in substance that the board of councilmen of the city, upon the nomination of the mayor, shall appoint a Board of Commissioners of Registration and Election in and for the city of Detroit, who shall consist of four resident electors, and whose term of office shall be four years. This Board of Commissioners have placed wholly in their hands the appointment of the district boards of registration in every voting precinct in the city. They have also the absolute power of appointment of two of the three election inspectors in every voting district, leaving the electors the poor privilege of choosing the other upon the opening of the polls. Besides defining the powers and duties of said boards of commissioners, registration and election inspectors, the law prescribes the following qualifications of these officers as follows: *First.* "Said board" (of commissioners) "shall be strictly non-partisan in character, two members thereof to be from each of the two leading political parties in the said city." *Second.* "One of said registrars" (district board of registration) "to be from each of two leading political parties in said city." *Third.* "One inspector" (of elections) "so appointed to be from each of the two political parties represented in the common council of said city." The law also provides that if any vacancy shall occur in the district registrars or election inspectors such vacancy shall be filled from the same political party to which the absentee belongs.

Section 1, article vii of our Constitution prescribes the qualifications of electors. It contains no provision for a registration law; and such a law can only be sustained and upheld under section 6 of article vii of that instrument, which authorizes the Legislature to pass laws "to preserve the purity of elections, and guard against abuses of the elective franchise." The Legislature is utterly powerless to pass

any act to hinder or abridge, in the exercise of the electoral right, any person who is an elector under the Constitution, except the manifest intent and operation of the law be to protect the legal voters from fraud and abuse of the elective franchise. If a registration law therefore is constitutional, it must be so drawn as by its terms to proscribe no man because of his political belief; and the officers whose duty it is to operate the machinery of registration and election, who sit in judgment upon the right of citizens to vote, cannot by law be restricted to any one or two political parties.

We must take judicial knowledge of the current undisputed history of our State and country, and act upon the assumption and the fact that there are to-day, at least in the State of Michigan and in the city of Detroit, four political parties, to wit, Republican, Democratic, National or Greenback, and Union or Prohibition. To confine the registration and election boards to men composed wholly of any one, two or three of these parties would be a plain violation of the spirit of our Constitution, and have a tendency to hamper and abridge the elective rights of those belonging to the political party or parties who by law would not and could not have any representation upon such boards. But such a law is also in direct conflict with the plain letter of the Constitution. Section 1, article xviii, of that instrument, after prescribing the form of the official oath of members of the Legislature and of all officers, executive and judicial, concludes as follows: " And no other oath, declaration, or test shall be required as a qualification for any office or public trust."

In my opinion there can be no doubt but this law subjects the officers of registration and election in Detroit to a political test. If the two leading parties in that city be Democratic and Republican, then any citizen who cannot by reason of his political conscience ally himself with one or the other of these parties is debarred by law of the right of holding one of these offices. If the National and Prohibition parties should be the two leading ones, then the Republican or Democrat would be ostracised. There can be in a true

republican government no political or religious test in holding office, the political and religious liberty of the citizen, being at the foundation of republican institutions. If this law had provided in express terms that these various boards should be equally divided between Democrats and Republicans, its repugnance to the Constitution would be plainly apparent to all. As it is, it accomplishes by indirect language the same result.

The opinion of Chief Justice Campbell in *People v. Hurlbut* 24 Mich. 90–92, correctly applies the principle that no person can be prevented from holding office because of his political opinions.

Suppose the Legislature should enact a law that the school officers of any city or village in this State should be selected equally from the members of the two leading churches therein, making a religious test, would any one argue for a moment that such an act was constitutional? And certainly the right of the citizen to his political opinions is and should be as zealously guarded as his right to his religious belief.

It is urged that the political proscription in this law is less than actually takes place without it; that those having the appointing power of registrars and inspectors under the old law do in Detroit, as a matter of fact, appoint all these officers from one party instead of two, thus precluding still more citizens from these places. In answer it can be said that this is an abuse of power not sanctioned by the law, but permitted, if at all, by its silence, while this Act before us puts the seal and stamp of approval upon the very abuse it seeks to cure, and makes it a requisite for these officers to be partisans of a certain name or designation, thus making this evil of partisan appointment a permanent feature of our State polity. For if the Legislature has power to require that these offices shall be filled by members of two parties only, it is competent to pass a law that they shall be holden only by the members of the leading party; and a partisan majority in the Legislature might fix the political belief of every municipal officer in the State, taking from the people of the locality the right to have a government of a different

political color than the Legislature. The remedy is worse than the disease. It is not only political oppression, but a deprivation of a local self-government.

Suppose that in one or more election districts in the city of Detroit the Nationals and Prohibitionists combined were numerically stronger than the united Republicans and Democrats, though a minority in the whole city. Then, in these days of party coalition, it might be possible for the Democrats and Republicans controlling the boards of registration and election in the city, and in these wards and districts, to combine against the other two parties in such districts. In such a case there would be naturally the same incentive to and opportunity for frauds and abuses as if all the registrars and inspectors belonged to one party, and it is therefore doubtful if the present law would in all cases have the effect desired.

Suppose, further, the two leading parties in Detroit to be, as they actually are, Democratic and Republican. The plurality of these dominant parties over the third party might be so small and trifling in the entire city that in two-thirds or even three-quarters of the wards in the city the third party might have a plurality of votes over either, and yet have no representation except one inspector upon any of these boards, and therefore liable to be subject to the same evils that we now deplore.

Again, the inspectors must be of the same political shade as the two leading parties in the common council; and it would not be an unusual thing to have the leading parties in the city not the same as the leading parties in the common council.

The argument might be elaborated further, but it is useless. In any way we turn this law, and apply it to the common every-day occurrences in political life and action at our elections, the more clearly does it appear that this act can have no other effect than a disfranchisement of a large body of the people from holding these offices, simply because they are politically for the time being in the minority in the whole city. And it should be remembered that all are liable

to bear its ostracism.   The changes and fluctuations in votes constantly going on often places the majority at the last election in the minority in the next, and they who wield the club of power under this law to-day may feel themselves its weight to-morrow.

I fully agree in the views so ably expressed by Justice Campbell in the leading opinion filed in this cause.   The nearer the officers are to the people over whom they have control, the more easily and readily are reached the evils that result from political corruption, and the more speedy and certain the cure.   The form of our State government presupposes that the people of each locality, each municipal district or political unit, are intelligent and virtuous enough to be fully capable of self-government, and the idea that the farther removed the election officers are from the people the less we encourage fraud and the more nearly we attain virtue at the ballot-box, is not in harmony with the theory and spirit of our institutions.   It matters not what legislation has heretofore been adopted in the same road with this law; it is our duty to deal with the encroachment brought before us and to remove it.

The writ of mandamus must be denied.