German **ORTIZ** et al., Plaintiffs,

v.

Hon. Rafael **HERNANDEZ COLON**, Governor of the Commonwealth of Puerto Rico, et al., Defendants.

Civ. No. 8–73.

United States District Court,
D. Puerto Rico.
Jan. 16, 1974.

Nachman Felstein & Gelpi, San Juan, P. R., for plaintiffs.

Dubon & Dubon, San Juan, P. R., for defendants.

## OPINION

Before COFFIN, Circuit Judge, CANCIO, Chief District Judge, and PESQUERA, District Judge.

COFFIN, Circuit Judge.

Plaintiffs, on behalf of themselves and all the registered voters of the Commonwealth of Puerto Rico who reside within San Juan, seek to enjoin five assemblymen within the San Juan Municipal Assembly, appointed by the Governor of Puerto Rico, from performing their official acts. They also seek a declaratory judgment that L.P.R.A., tit. 21, § 1152 (b), which authorizes such appointments, unconstitutionally deprives the citizens of San Juan of the equal protection of the laws, under the principle of "one-person, one-vote".[1] This case comes to us on remand from the Court of Appeals which vacated the judgment of the District Court, denying plaintiffs' request for a three judge court. Ortiz v. Colon, 1 Cir., 475 F.2d 135, 1973.

The facts are simple and uncontested. San Juan, capital city of the Commonwealth, contains approximately twenty-five per cent of the island's population. The statutory scheme for the composition of the Municipal Assembly of San Juan provides for twelve elected assemblymen and five additional assemblymen appointed by the Governor. Legislation before the Municipal Assembly normally requires approval by a majority of the assemblymen, although important legislation, such as the issuance of bonds or the entering into contracts with the federal government, requires a two-thirds majority.

■ At the outset, we fully recognize that local governments require flexibility and room for innovation if they are to meet complex urban problems which are increasingly regional in character. *See* Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971); Sailors v. Board of Education, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1966). "To stay experimentation in things social and economic is a grave responsibility." New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747 (1931) (Brandeis, J., dissenting). City boundaries often fail to reflect the economic and social interdependence of larger municipal regions. Political decisions within one local jurisdiction often have a direct impact upon other local jurisdictions within the same area, since the jurisdictional boundaries hail from a simpler era when distinct communities had their own distinct concerns. In short, the modern megalopolis, straddling cities, suburbs, and rural countryside, requires new forms of government which are responsive to a larger, more complicated, and more varied constituency, *See* Dusch v. Davis, 387 U.S. 112, 117, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1966). State governments have already begun to experiment with regional government in the form of metropolitan planning councils, regional transportation authori-

---

1. While the policy announced in Fornaris v. Ridge Tool Co., 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970) would, perhaps, have us wait until the Commonwealth's own courts had had opportunity to confine the statute so to avoid constitutional infirmity, we think *Fornaris* is inapplicable where, as in the present case, the statute states precisely that "The Municipal Assembly of San Juan shall be composed of seventeen (17) members. Twelve (12) of [whom] shall be elected at each general election by the qualified voters of San Juan and the other five (5) shall be appointed by the Governor with the advice and consent of the Senate . . . .", and is therefore subject to only one reasonable interpretation. Nor was *Fornaris* raised by either of the parties.

ties, and associations of local governments, whose members are either appointed directly by the legislature or the governor or elected, pyramid-style, by the elected representatives of local communities.[2] We also give full deference to the traditional doctrine that municipal governments are mere "instrumentalities" of the states, created as convenient agencies for the exercise of such of the government powers of the states as may be entrusted to them, and that the extent of their powers and the extent of their territories rest in the absolute discretion of the states. Reynolds v. Sims, 377 U.S. 533, 575, 84 S.Ct. 1362, 12 L. Ed.2d 506 (1964); Hunter v. City of Pittsburg, 207 U.S. 161, 178, 28 S.Ct. 40, 52 L.Ed. 151 (1907); Padron v. People of Puerto Rico, 142 F.2d 508, cert. denied, 323 U.S. 791, 65 S.Ct. 427, 89 L.Ed. 630 (1944).

■ Neither the policy favoring pluralism and experimentation nor the doctrine of dependence of municipalities on state power, however, can wholly shield state-dictated municipal arrangements from constitutionally oriented judicial oversight. The Equal Protection clause of the Fourteenth Amendment[3] "reaches the exercise of state power however manifested, whether exercised directly or through the subdivisions of the State." Avery v. Midland County, 390 U.S. 474, 479, 88 S.Ct. 1114, 1117, 20 L.Ed.2d 45 (1967). Moreover, "[i]n-

stitutions of local government have always been a major aspect of our system, and their responsible and responsive operation is today of increasing importance to the quality of life of more and more of our citizens." *Id.* at 481, 88 S.Ct. at 1118. The delicate challenge for the courts is to discern and identify constitutional limits within which these new forms of municipal government may develop without trampling underfoot the constitutional rights of their citizenry.

■■ In the present case, plaintiffs contend that the legislative scheme for constituting San Juan's Municipal Assembly results in an unconstitutional deprivation of equal protection in that residents of San Juan are denied "one-person, one-vote". If, by this, plaintiffs mean that the votes of residents of San Juan, taken as a whole, are "diluted" relative to the votes of residents of other Puerto Rican cities in their own municipal elections, we think their contention is unfounded. To argue that voting strength is "diluted", under equal protection analysis, implies that one group of citizens has more voting power than another group within the same constituent assembly. It is no violation of equal protection that citizens of Puerto Rico who live in cities outside San Juan may have more direct control over their municipal assemblies than residents of San Juan have over their own. A state has wide authority to classify cities differently,

2. Among the most pronounced examples are (1) Minnesota's Twin Cities Metropolitan Council, which has jurisdiction over Minneapolis, St. Paul, and the seven-county area surrounding them. It was created, in part, to meet federal requirements that applications for loans and grants under approximately thirty-nine separate federal programs be administered by an agency having responsibility for metropolitan planning. Its fifteen members are all appointed by the Governor. (2) New York's metropolitan region, covering parts of three states, is administered by several regional authorities, among them the Metropolitan Transportation Authority, the Port of New York Authority, the Interstate Sanitation Commission, and the Tri-State Transportation Commission. Members of all these authorities are appointed by the three governors. (3) San Francisco Bay's Associ-

ation of Bay Area Governments (ABAG) has general responsibility for the planning and development of regional transportation and industry in the Bay area. The association is comprised of representatives, elected pyramid-style, from 625 local governmental units, including San Francisco, Oakland, and San Jose. *See generally*, Jones, Metropolitan Detente: Is It Politically and Constitutionally Possible? 36 Geo.Wash.L.Rev. 741 (1968).

3. We need not decide at this point whether Puerto Rico is a state for the purposes of applying the Fourteenth Amendment, or a subdivision of the federal government, in which case the Fifth Amendment would apply. Plaintiffs cite both amendments, and the government has not argued this issue.

and institute different voting schemes within each. Missouri v. Lewis, 101 U.S. 22, 31, 25 L.Ed. 989 (1897); see also Opinion of the Justices, 277 Ala. 630, 173 So.2d 793 (1965).

■■ Nor does the Equal Protection clause prohibit a state from permitting non-residents of a municipality to vote in the municipal elections. Allowing citizens who possess only a remote or indirect interest in the outcome of an election to vote in that election does not necessarily "dilute" the votes of those with a more direct interest. Glisson v. Mayor and Councilmen of Savannah Beach, 346 F.2d 135 (5th Cir. 1965).

■ To the extent, however, that, in claiming a denial of "one-person, one-vote", plaintiffs contend that San Juan's scheme for constituting its Municipal Assembly dilutes the voting power of some San Juan residents relative to other San Juan residents, we agree. "[T]he concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged." Reynolds v. Sims, *supra*, 377 U.S. at 565, 84 S.Ct. at 1383. Here, residents of San Juan who vote in the statewide gubernatorial election for the winning candidate gain the indirect representation within the Municipal Assembly, of the five assemblymen appointed by the Governor. In effect, residents of San Juan who, in voting for governor, find themselves in accord with a majority of their fellow electors—many of whom may reside outside the city—have significantly more voting power in their own Municipal Assembly than residents of San Juan who supported a losing gubernatorial candidate. ˎ The Governor's five appointees owe their allegiance, in large part, to those voters who supported the Governor in the last gubernatorial election, voters whose interests and views they are likely to represent. And because the appointees are members of the same legislative body, with the same functions and duties, as the elected members, a local minority of voters within San Juan that happens to be part of a statewide majority may gain a majority of votes within the Municipal Assembly. Such a minority need elect only one assemblyman directly to defeat an issue requiring a two thirds vote; and it can run all of the affairs of San Juan if it succeeds in electing directly a mere third of the elected members. This additional representation for the minority, albeit indirect, results in systematic discrimination against those San Juan voters who did not support the winning gubernatorial candidate.

■ In a consistent line of decisions, beginning with Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), dealing with congressional apportionment, and Reynolds v. Sims, *supra*, dealing with state legislative apportionment, and extending through Avery v. Midland County, *supra*, and Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1969), both dealing with local legislative bodies, the Supreme Court has held that "in situations involving elections, the States are required to insure that each person's vote counts as much, insofar as it is practicable, as any other person's." *Hadley, supra,* 397 U.S. at 54, 90 S.Ct. at 794. While the particular election schemes involved in these cases have varied, "in each case a constant factor is the decision of the government to have citizens participate individually by ballot in the selection of certain people who carry out governmental functions." *Id.* at 54, 90 S.Ct. at 794. The initial decision to select a legislative body by popular election acts as a threshold; once that decision has been made, then the Equal Protection clause of the Fourteenth Amendment requires that each qualified voter be given the same opportunity to determine the membership of that legislative body as every other qualified voter.[4] In determining the membership of San Juan's Municipal Assembly, however,

4. In *Hadley, supra,* 397 U.S. at 58, 90 S.Ct. at 796, the Court says that "where a State chooses to select members of an official body by appointment rather than election, and that

some San Juan residents have more opportunity than others.

The Supreme Court has tended to use one of two standards for review when determining whether a particular state action which discriminates between groups of people violates the Equal Protection clause of the Fourteenth Amendment. The Court has employed a relaxed review of certain state action, normally in the areas of economic regulation and taxation, if it is sustained by a rational and legitimate state interest. But where state action substantially infringes upon fundamental interests, the Court has employed a stricter scrutiny, requiring a showing that the state action is reasonably necessary to promote a compelling state interest.

■ Not every limitation or incidental burden on the exercise of voting rights is subject to strict scrutiny. Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); McDonald v. Board of Election, 394 U.S. 802, 89 S. Ct. 1404, 22 L.Ed.2d 739 (1969). In a series of recent decisions, the Supreme Court has given states some leeway in designing apportionment schemes which are reasonably related to valid state policies, such as respecting the boundaries of political subdivisions. *See* Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). In none of these more recent cases, however, has the Court found the infringement upon voting rights to be a "substantial" one.

■ When the infringement upon voting rights becomes substantial, the higher standard of scrutiny is invoked, "[e]specially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights . . . ." Reynolds v. Sims, *supra,* 377 U.S. at 562, 84 S.Ct. at 1381. A substantial infringement upon voting rights occurs when other basic civil and political rights, such as the First Amendment right of association, are impaired. *See* Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); Mancuso v. Taft, 476 F.2d 187 (1973); Police Department of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); Williams v. Rhodes, 393 U.S. 23, 89 S. Ct. 5, 21 L.Ed.2d 24 (1968).

■ An infringement of voting rights at the local level is particularly likely to impair the right of association, for it is within communities and neighborhoods that political association can be most effective. Local political organization has long functioned as the backbone of American politics, and local government has been the traditional training ground for political organizing. Generations of Americans, including immigrant and urban poor, have learned the importance of local political organization through its impact upon local government. The impetus to exercise the right of association is dependent upon its

choice does not itself offend the Constitution, the fact that each official does not 'represent' the same number of people does not deny those people equal protection of the laws", citing *Sailors, supra.* Although this could be read to mean that a state may appoint some members of an otherwise elected legislative body, without regard to the principle of "one-person, one-vote", we believe this to be an unlikely interpretation of the Court's opinion, for two reasons. First, other parts of the opinion clearly indicate that once an initial decision has been made to select legislators by popular election, voters must be given an equal opportunity to participate in that election. *Id.* 397 U.S. at 56, 90 S.Ct. 791, 25 L.Ed. 78, 481. Equal opportunity to participate would be a hollow guarantee if any number of additional legislators could be appointed without regard to equal representation. Secondly, the opinion of the Court in Sailors v. Board of Education, *supra,* to which the Court here refers, specifically leaves open the question of whether *legislators,* rather than non-legislative officials, may ever be appointed. Thus, in holding that a state may appoint certain officials without regard to "one-person, one-vote", *Sailors* refers only to non-legislative officers, and can in no way stand for the proposition that *legislators* may be appointed without regard to equal representation.

political effectiveness, and the effectiveness of the right of association is intimately linked, at the local level, to the power of the vote. Williams v. Rhodes, *supra,* 393 U.S. at 41, 42, 89 S.Ct. 5, 21 L.Ed.2d 24; Mancuso v. Taft, *supra,* 476 F.2d at 196. "[T]he effect of self-government where equal political rights have their fair value is to enchance the self-esteem and the sense of political competence of the average citizen. His awareness of his own worth, developed in the smaller associations of his community, is confirmed in the constitution of the whole society." J. Rawls, A Theory of Justice 234 (1972). If the power of the local vote is infringed by a voting scheme which allows a local minority to gain a majority within the municipal assembly, as in the present case, local political association is made ineffective, and the right of association is thereby discouraged.[5] In Mancuso v. Taft, *supra,* 476 F.2d at 196, the court used strict review to invalidate a Cranston, Rhode Island charter provision that prohibited city employees from continuing to serve the city after becoming candidates for public office. The court found that the First Amendment protected the freedom to associate, and that freedom was infringed when the city

effectively barred its employees from seeking office, thereby narrowing the options available for political organization. The scheme before us for constituting San Juan's Municipal Assembly affects association rights even more dramatically: if the majority of San Juan voters lack sufficient power to gain a majority of seats in the Municipal Assembly, their options for political organization are severely narrowed. This case is in no fundamentally distinguishable posture from that which would be presented if the proportions were reversed by a New York law which allowed the citizens of New York City to elect five of seventeen council members, the governor to appoint twelve. We cannot conceive that a court would fail to find that, under such an arrangement, the freedom of association of New York City's millions had been substantially infringed. We conclude that L.P.R.A., tit. 21, § 1152(b), infringing upon fundamental First Amendment rights, must receive strict equal protection scrutiny.

In order for the scheme to withstand strict scrutiny, the appellees must show that appointment by the governor of five members of San Juan's Municipal Assembly is a reasonably necessary measure to achieve a compelling state inter-

5. Our explication of the important relationship existing between the First Amendment right of association and the right to vote in local governmental elections should not be taken to mean that the First Amendment is infringed whenever and wherever local governments are appointed, rather than elected, or when no local government exists. We hold, simply, that when provision is made for local government elections in which the voting power of some local electors is diluted relative to the voting power of others, it is likely that the associational rights of the former are substantially burdened, because their ability to engage in effective political organizing is impaired. In Sailors v. Board of Education, 387 U.S. 105, 110, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1966), the Supreme Court specifically reserved judgment on whether local legislators may be appointed, rather than elected. *But see* dissenting opinion of Mr. Justice Fortas in Fortson v. Morris, 385 U.S. 231, 242, 87 S.Ct. 446, 17 L.Ed. 2d 330 (1966), indicating that the Consti-

tutional guarantee of a republican form of government, embodied in Article IV, § 4, would require popular election. *See also* the opinions of several state courts, holding that citizens have an inherent right, grounded in the Common Law, to local "home rule". Kansas City v. School District of Kansas City, 356 Mo. 364, 201 S.W.2d 930 (1947); Dowell v. Board of Education of Oklahoma City, 185 Okl. 342, 91 P.2d 771 (1939); State v. Bass, 171 N.C. 780, 87 S.E. 972 (1916); Hawkins v. Grand Rapids, 192 Mich. 276, 158 N.W. 953 (1916); State v. Burr, 65 Wash. 524, 118 P. 639 (1911); Att. Gen. v. Detroit, 58 Mich. 213, 24 N.W. 887 (1885).

We fully recognize, in addition, that many incidental burdens on voting rights may have an indirect impact upon the freedom to associate. But when the burdens on voting rights are local in character and enable a local minority to gain a majority within the municipal assembly, the right to associate will be directly discouraged and the burden upon voting rights will be substantial.

est. Kramer v. Union Free School District, 395 U.S. 621, 627, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). Appellees contend that San Juan's unique relationship with the rest of the island of Puerto Rico, based in part upon its historical role as capital city and in part upon its present dominance as the center of the island's cultural and commercial life, requires that citizens of Puerto Rico who live outside San Juan be given some influence over how municipal affairs, certain to affect them, are conducted. *See* Diario de Sesiones, Senate of Puerto Rico, vol. xiii, tomo 4, at 1715. Undoubtedly, states have an important interest in providing all their citizens with the means of exerting some influence over governmental decisions, even at a local level, that affect their lives. The fate of San Juan's port, its university, its main traffic arteries, its banks and its industry is certain to have an important effect upon citizens of Puerto Rico living outside the city limits. Their stake in San Juan, and Puerto Rico's interest in protecting that stake, is a compelling one.

Yet we do not consider the means chosen to achieve this end as reasonably necessary. In pursuing such compelling interests states cannot choose means which unnecessarily burden or restrict constitutionally protected activity. Dunn v. Blumstein, 405 U.S. 330, 343, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). Statutes affecting constitutional rights must be drawn with precision, NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); United States v. Robel, 389 U.S. 258, 265, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967), and they must be "tailored" to serve their legitimate objectives. Shapiro v. Thompson, 394 U.S. 618, 631, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Most importantly, if there are other, reasonable ways to achieve these goals while imposing a lesser burden upon constitutionally protected activity, a state may not choose the way of greater interference. If it acts at all, it must choose "less drastic means".

Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *see* Note, Less Drastic Means and the First Amendment, 78 Yale L.J. 464 (1969).

Here, the important stake had by non-residents of San Juan in certain aspects of the city's administration is sought to be protected by five representatives in the Municipal Assembly, appointed by the governor of Puerto Rico. The scheme is improperly "tailored" for its legitimate objective.

The interest of non-residents of San Juan in those aspects of San Juan government most likely to affect them is at best remotely protected by the statutory scheme. There is no requirement that these five representatives reside outside the city of San Juan, or that they share any of the interests of non-residents. Indeed, we were told at argument that they are in fact residents of San Juan. Instead, they owe their allegiance to the governor and, indirectly, to all those who elected the governor, many of whom may reside within the city of San Juan. Nor is there any requirement that they possess any special expertise concerning any of the matters which may be of especial concern to non-residents; that they have any systematic guidance or staff help from the legislature or governor; or that they account in any way for their actions. Furthermore, even if the interest of non-residents were more fully protected, the scheme would be excessive and over-inclusive, since the five appointees exert just as much influence over parochial matters, such as the condition of local streets, as they do over matters that have a broad impact upon outlying districts.

Several alternatives are available which are likely to achieve the statutory goal with less burden upon constitutionally protected rights, such as the creation of special-purpose authorities, each having responsibility over an aspect of San Juan government that had a direct impact upon non-residents of San

Juan. The Supreme Court has recently exempted such special-purpose units of government from the "one-man, one-vote" rule, suggesting that discrete public services, not financed by a single municipality, and affecting only certain groups of citizens, may be administered without regard to the mandates of *Reynolds, supra, Hadley, supra,* and *Avery, supra.* Salyer Land Co. v. Tulare Lake Basin, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973). Another example would be a Commonwealth review and veto over certain of San Juan's legislation that would be likely to have an important impact upon the rest of the country.

We conclude, therefore, that the *statutory scheme employed* by the Commonwealth of Puerto Rico for constituting the Municipal Assembly of San Juan constitutes an unconstitutional deprivation of equal protection, and substantially impairs the voting rights of certain residents of San Juan. In order to give the legislature of Puerto Rico an opportunity to bring its statutory scheme for constituting San Juan's Municipal Assembly into accord with the Equal Protection clause of the Fourteenth Amendment, we will retain jurisdiction while deferring a hearing on the issuance of a final injunction for one year. Our decision to withhold immediate relief in this case is grounded on our desire to avoid a sharp disruption both of the electoral process and the governance of San Juan. As stated by Mr. Justice Douglas, in concurring in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), "any relief accorded can be fashioned in the light of well-known principles of equity."

It is so ordered.

CANCIO, Chief District Judge, dissents for the reasons stated in his Opinion and Ruling from the Bench on January 8, 1973, specifically beginning at line 18 of page 11 of the transcript of the proceedings of that day.