Angel Manuel CINTRON-GARCIA, et al.,
Plaintiffs, Appellees,

v.

Carlos ROMERO-BARCELO, etc., et al.,
Defendants, Appellees.

Partido Popular Democratico, et al.,
Defendants, Appellants.

No. 81–1914.

United States Court of Appeals,
First Circuit.

Argued Jan. 22, 1982.

Decided Jan. 27, 1982.

Lino J. Saldana, Santurce, P. R., with whom H. Febus Bernardini, Santurce, P. R., Marcos Ramirez and Marcos Ramirez Lavandero, Hato Rey, P. R., were on memorandum for defendants, appellants.

Eduardo L. Buso, San Juan, P. R., for defendant, appellee, Hector Reichard de Cardona, Secretary of Justice.

Marvin S. Cohen, with whom John M. Gibbons and Stroock, Stroock & Lavan, Washington, D. C., were on memorandum for plaintiffs, appellees.

Before COFFIN, Chief Judge, CAMPBELL and BREYER, Circuit Judges.

PER CURIAM.

On December 14, 1981, a federal district court in Puerto Rico preliminarily enjoined Commonwealth officials from filling a between-elections vacancy in the Commonwealth's House of Representatives according to the procedure set forth in the Constitution of the Commonwealth of Puerto Rico. The district judge believed that the constitutionally-mandated procedure, which allows the political party of the representatives whose seat fell vacant to choose his successor, probably violated the federal constitution. Defendants, the Popular Democratic Party ("PDP") and Hector L. Acevedo, its election commissioner, appeal. We believe that the issuance of a preliminary

injunction was erroneous, and we vacate the injunction.

## I

The Constitution of Puerto Rico provides that its House of Representatives shall be comprised of 51 members, 40 of whom shall be selected by election from single-member districts and 11 of whom shall be selected at large. The at-large representatives are the 11 persons obtaining the most votes in a Commonwealth-wide election—one in which each voter can vote for only 1 representative. Article III, Section 2 and Section 3. *See Garcia Passalacqua v. Tribunal Electoral,* 105 D.P.R. 49 (1976). Should an at-large seat fall vacant in between the quadrennial elections, the President of the House is to appoint a successor "upon recommendation of the political party to which belonged the . . . Representative causing the vacancy, with a candidate selected in the same manner as that in which his predecessor was selected." *Constitution of Puerto Rico,* Article III, Section 8.

In the general election held on November 4, 1980, Fernando J. Tonos Florenzan, a member of the PDP, was elected an at-large representative. Subsequently, he was disqualified because he was 23 years old—2 years younger than the minimum age the Constitution prescribes. Article III, Section 5. His seat was declared vacant. *Tonos Florenzan v. Bernazard,* 111 D.P.R. ——, 81 JTS 78 (1981).

On December 10, 1981, before his successor could be selected, 8 registered voters—plaintiffs here—filed suit alleging that the replacement procedure violates the First, Fifth and Fourteenth Amendments to the United States Constitution because it does not provide for a by-election open to all voters regardless of party. They sought a declaratory judgment, an order compelling a by-election and, subsequently, a temporary restraining order ("TRO").

The district court, while denying the TRO, quickly held a hearing and, on December 14, 1981, it issued a preliminary injunction effectively holding the seat vacant until it could decide the constitutional issue.

Defendants appealed. Subsequently, on January 5, 1982, it denied a request to stay the injunction pending appeal. Defendants, noting that the House is divided evenly between the two major parties (25–25) and arguing that the House could not function properly, sought a stay from this court pending decision on their appeal. The issues were briefed effectively by all parties on an expedited schedule and oral argument was heard on January 22, 1982. As the parties agree, the question of whether we should stay the injunction pending appeal raises the same issues as the appeal itself. Hence, we here decide the appeal—the validity of the preliminary injunction.

## II

In determining whether a plaintiff is entitled to a preliminary injunction, the court normally considers four criteria, namely, "(1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction." *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir. 1981) (*quoting Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542, 544 (D.Me.1979)). While the application of these criteria to the facts of a particular case ordinarily lies within the sound discretion of the trial courts, *Grimard v. Carlston,* 567 F.2d 1171, 1173 (1st Cir. 1978), we will reverse a trial court when it has applied an improper standard, or where it has misapplied the law to particular facts. *Amalgamated Transit Union v. Commonwealth of Massachusetts,* 666 F.2d 618 at 645 (1st Cir. 1981); *Planned Parenthood League of Massachusetts v. Bellotti, supra.* That is to say, we will reverse where the record plainly reveals that the underlying facts as reasonably found by the court, viewed in light of the proper standard, could not support the injunction's issuance. Such is the case here.

## A

As the criteria listed above indicate, in deciding whether a preliminary injunction is appropriate, a district judge must engage in a balancing of harms. A preliminary injunction should in the usual case not issue unless the harm to plaintiff, in its absence, outweighs the harm to defendant that it may cause. The district court wrote that the requisite harm is to be found in the fact that allowing the PDP-selected replacement to take his seat pending resolution of this legal controversy would "moot" the case. It is wrong on this point. This controversy would remain real despite the seating of a replacement—at least until the election of a new representative at the next general election in 1984. Litigation could continue in this case just as it has in the related case of *Partido Popular Democratico v. Gobernador*, 111 D.P.R. ——, 81 JTS 41 (1981), where the Supreme Court of the United States has allowed the replacement representative for District 31 to be seated while it passes on the Constitutional validity of the process through which he was chosen.[1] Should plaintiffs eventually prevail, in either case, presumably the seats at issue will be declared vacant just as was the seat of Tonos Florenzan.

The district court also found irreparable harm in the fact that, if plaintiffs later win, the voters would have been subject to laws enacted with the help of an unconstitutionally-selected legislator. This harm would seem at least equally balanced, however, by the interim harm that an injunction would have caused defendants if they later win, for in that case, those who voted for Tonos Florenzan in light of his party affiliation would wrongly have had *no* representative, see p. 7 and n.5 *infra*. The PDP would have been deprived of what otherwise appears to be a one-vote majority leaving the House deadlocked with the Governor a member of the major rival party. Indeed, viewed from the point of view of the political parties, the harm to one caused by an injunction "wrongly" (as the case turns out) withheld would seem exactly balanced by the harm to the other caused by an injunction "wrongly" issued. And, the harm to some voters through the possible enactment of laws with the participation of a "wrongly" appointed legislator would seem at the least counterbalanced by the harm to others caused by failure to pass laws (or the passage of other laws) brought about by "wrongly" keeping a seat vacant during the January—April legislative session.

We are aware of no special factors tilting the balance in favor of plaintiffs. To the contrary, the facts that for many years legislators have been chosen in accordance

---

1. In *Partido Popular Democratico v. Gobernador*, 111 D.P.R. ——, 81 JTS 41 (1981), the Supreme Court of Puerto Rico faced a statutory question involving a problem similar to the one we face today. There, a vacancy was created in the House of Representatives by the death of a district (not an at-large) representative. Interpreting the *statutory* provision establishing the procedure for the filling of vacancies in district seats, the Supreme Court held that no by-election was required for filling the vacancy. Addressing a federal right-to-vote question, the Supreme Court of Puerto Rico noticed that "[t]he Constitution of the United States does not require either a fixed method for filling vacancies." Addressing an attack on equal protection grounds, the Court ruled:

> ... the method designed by the lawmaker has no defects with regard to the equal protection of the law. The exclusion of candidates of other parties and of independent candidates does not violate the constitutional guarantee to the equal protection of the law.

> Even assuming that the strict scrutiny rule is applicable, there is compelling public interest directing the lawmaker to consider that the vacant seat belongs to the party who nominated the legislator. Among those compelling interests the following can be singled out: that there be no changes in the legislative balance until the next general election is held, the stability of governmental structures, the protection of the electoral mandate of the previous general election, and the reduction of inter-partisan political campaigns to once every four years.

The Supreme Court of the United States, *sub nom. Rodriquez v. Popular Democratic Party*, noted probable jurisdiction of an appeal from the judgment of the Puerto Rico courts, —— U.S. ——, 102 S.Ct. 472, 70 L.Ed.2d 246 (1981). However, the full Court decided not to stay the mandate of the Commonwealth Supreme Court pending its hearing, 453 U.S. 907, 101 S.Ct. 3138, 69 L.Ed.2d 991 (1981).

with the challenged constitutional provisions, and that the Supreme Court of the United States has allowed another legislator facing a similar constitutional challenge to sit while that challenge is resolved, (see note 1 *supra*), suggests that there is no emergency requiring an immediate injunction. Plaintiffs' ingenious argument that the injunction simply preserves the status quo overlooks the fact that "status quo" in this context should encompass the normal functioning of the legislature and electoral processes in accordance with the provisions of the Constitution of Puerto Rico. Be that as it may, the district court finding that the harm to plaintiffs *outweighs* that likely imposed upon those whom the injunction affects adversely, is clearly erroneous.

## B

We shall go next to plaintiffs' claim that they are so clearly right on the merits as to warrant injunctive relief even if the harms are no better than evenly balanced. *Cf. Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 924 (3d Cir. 1974). We reject this claim, for we believe that it is defendants, not plaintiffs, who have shown a likelihood of success on the merits.[2]

Plaintiffs' claim that Article III, Section 8 is unconstitutional rests upon two arguments. First, they argue that it violates the First, Fifth and Fourteenth Amendments to the Constitution for a state (or for the Commonwealth) to fill a legislative vacancy by appointment rather than through a by-election—at least where the next general election may be as much as three or four years away. In support, they cite reapportionment cases such as *Reynolds v. Sims*, 377 U.S. 533, 554, 84 S.Ct. 1362, 1377, 12 L.Ed.2d 506 (1964), stressing the constitutionally protected "right of all qualified citizens to vote in state as well as in federal elections;" they also refer to British and American by-election practice at the time

the Constitution was written and to other authority suggesting that the right to vote in elections for state legislators is protected by the federal constitution. *But cf. Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 176, 178, 22 L.Ed. 627 (1875); *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 35 n.78, 93 S.Ct. 1278, 1297 n.78, 36 L.Ed.2d 16 (1973). Second, they argue that in any event neither a state nor the Commonwealth constitution can require the appointment of a person selected by one political party. To do so, they assert, would unconstitutionally discriminate against members of the other political parties, for it may well allow them no voice whatsoever in the selection of the person who will represent them in the legislature. In support of this proposition, they cite *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), *Kramer v. Union Free School District*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), and other authority that holds or suggests that statutes denying the franchise to certain citizens will be closely scrutinized and probably struck down when access to the ballot is limited because of political belief or party affiliation.

We are not convinced by these lines of argument for three sets of reasons. First, as plaintiffs admit, none of these authorities directly considers whether it is constitutional to appoint a successor to fill an interim legislative vacancy. According to the undisputed assertion of the defendants, at least 21 states allow legislative vacancies to be filled by the appointment of a successor who will serve until the next general election or the end of the predecessor's term. Of these, at least 12 require that the appointee be a member of the same political party as his predecessor; and four others allow the political party itself to make the selection. When this type of provision has been challenged, the courts, with one exception, have upheld its validity. *See, e.g.,*

---

2. The district judge, when referring to the likelihood of success in this case, used the phrase, "substantial possibility" of success. Except in the unusual case, however, where the harm to plaintiffs is particularly severe and disproportionate, *see Providence Journal Co. v. Federal Bureau of Investigation*, 595 F.2d 889, 890 (1st Cir. 1979), in this circuit a probability of success is ordinarily called for.

*Patterson v. Burns*, 327 F.Supp. 745, 749, 755 (D.Haw.1971) (three judge court) (vacancy in the Hawaii senate; "Plaintiff urges that his district would effectively be malapportioned were the governor permitted to appoint a senator to fill the vacancy.... [T]he court finds this argument to be without merit...."); *Kaelin v. Warden*, 334 F.Supp. 602, 606–08 (E.D.Pa.1971) (three judge court) (fillings of vacancies by appointment of a candidate belonging to the party of his predecessor sustained); *Wilson v. Oklahoma City Council*, 347 F.Supp. 306, 308 (W.D.Okl.1972) ("no authority has been ... found which declares unconstitutional any state law which directs the filling of a vacancy in public office by appointment rather than by an immediate election").[3]

These courts have reasoned that (1) the long history of filling vacancies by appointment, (2) the need to preserve the political balance obtained in previous general elections, (3) the expense and related inconvenience of calling special elections, (4) the uncertainty about the extent to which, or when, by-elections (with their typically lower turnout, dependency upon timing and different political strategies) are fairer alternatives than waiting until the next general election, (5) the need to assure a single party time to carry out a program, and other similar factors, indicate the wisdom of allowing the states themselves to decide whether, and when, to fill interim vacancies by appointment or by-election. There is no reason for denying Puerto Rico at least as much discretion or power. That the federal Constitution embodies this wisdom is suggested by the broad language used in relation to the form of a state's government ("the United States shall guarantee to every State ... a Republican Form of Government," Article IV, Section 4); by the Tenth Amendment's reservation to the states of powers not prohibited by the Constitution, and by the *absence* in the Constitution of any language requiring the contrary. Indeed, it was believed necessary to insert *specific* language into the Constitution providing for by-elections in the case of federal senators.[4] There is no such language applicable to state legislatures. (Moreover, even as to the "federal official" language which specifically requires a by-election, the federal courts have upheld the validity of interim appointments with twenty-nine months duration. *Valenti v. Rockefeller*, 292 F.Supp. 851 (S.D.N.Y.) (three judge court), *aff'd per curiam*, 393 U.S. 405, 89 S.Ct. 689, 21 L.Ed.2d 635 (1969).

Thus, considerations of "statutory" interpretation (the absence of any by-election language addressed to the states), practical considerations (cost along with possibly low turnout at by-elections for state legislature), considerations of judicial capacity (the highly subjective nature of determining when an interim appointment is "too long," given an appointment that is, in any event, bounded by the next general election), and considerations of federalism (state autonomy in determining, within fairly broad limits, the nature of its own political system) all make it likely that these decisions allowing interim appointments to fill state legislative vacancies remain good law.

Second, once it is assumed that an interim appointment process is constitutional, the cases assuring broad participation in the electoral process, such as *Kramer v. Union School District, supra,* and *Williams v.*

---

**3.** In the single exception, *Rudman v. Rini*, 64 Ill.2d 321, 1 Ill.Dec. 4, 356 N.E.2d 4 (1976), the Illinois Supreme Court held that to allow a political party to fill a nonlegislative county office violated the *state* constitution's separation of powers provision—a matter here only tangentially, if at all, relevant.

**4.** When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: *Provided,* That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct. XVII Amendment.

As to members of the House of Representatives, Article I, Section 2 of the U. S. Constitution provides, "When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies."

*Rhodes, supra,* become far less relevant, for they concern participation in elections that are admittedly, in principle, open to all. Similarly, the cases holding that party allegiance is an impermissible criterion for appointment to state office are of little help. *See, e.g., Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Here we deal with *legislative* office—an office which is highly political in nature and thus central to the function that a political party serves in a democracy. Rather, the issue here is whether selection by the party that won at the preceding election is somehow less consistent with the letter, or with the spirit, of the Constitution than appointment by a governor.

One might argue, as a matter of form, that appointment by a governor is indeed more "democratic" because the governor is himself elected. Yet in practice this is likely not to be so when the governor and former representative are of different parties. In that case the party difference is likely to produce successors of different parties. In such circumstances, we see how the framers of a state constitution might conclude that party selection is more likely to reflect the will of the voters than selection by the governor, for it was the former representative's party, not that of the governor, that won the prior seat. Such a judgment, reflecting a knowledge of political practice, seems perfectly consistent with the basic democratic role of the modern political party—translating the individual wills of myriad voters into a practically achievable program administered by a government that can be held responsible for its performance at the polls. *See* Schattschneider, *Party Government* 1 (1942); Finer, *The Theory and Practice of Modern Government,* 627 (1960). Although this type of vacancy selection might be unusual, found in only four states and Puerto Rico, it seems no less fair or democratic in principle than the party primary itself—an essential part of our democratic political system. *See, e.g., Cousins v. Wigoda,* 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975) (limiting the power of the states to enact laws inconsistent with political party's rules).

Third, the considerations favoring the constitutionality of party selection to fill an interim legislative vacancy are particularly strong here. Article III, Section 8 of the Constitution of Puerto Rico is part of a broader constitutional scheme designed to increase the likelihood of minority representation in the legislature. *See* Article III, Section 7. Section 8 provides that each voter in the election for eleven at-large representatives is to have only *one* vote. Presumably, the two major parties would exhaust most of their voting strength in electing the first 8, 9 or 10 representatives, leaving a minority party with the most votes for the 11th position. Article III, Section 8 complements this provision by stating that in case of vacancy, the party whose candidate won shall select the replacement.

A by-election requirement is inconsistent with the basic purpose of these two articles. A by-election for a minority party vacancy, for example, would almost certainly be won by a major party, for at a by-election (with one position at stake), unlike a general election (with eleven positions at stake), the major party's votes would not be split.

Plaintiffs argue that these provisions have recently achieved actual minority representation only once, in 1972. Regardless, they are reasonable in theory and continue to make minority representation easier to achieve. Similar "limited voting" provisions have been consistently sustained. *Hechinger v. Martin,* 411 F.Supp. 650 (D.D.C.) (three judge court) (limited voting scheme for the District of Columbia Council sustained), *aff'd per curiam,* 429 U.S. 1030, 97 S.Ct. 721, 50 L.Ed.2d 742 (1977); *LoFrisco v. Schaffer,* 341 F.Supp. 743 (D.Conn.1972) (three judge court) (limited voting scheme for the State of Connecticut sustained), *aff'd,* 409 U.S. 972, 93 S.Ct. 313, 34 L.Ed.2d 236 (1972); *Blaikie v. Power,* 13 N.Y.2d 134, 243 N.Y.S.2d 185, 193 N.E.2d 55 (limited voting for New York City Council sustained), *appeal dismissed,* 375 U.S. 439, 84

S.Ct. 507, 11 L.Ed.2d 471 (1964); *People v. Carpentier*, 30 Ill.2d 590, 198 N.E.2d 514 (1964). Apparently, the two major parties, to take maximum advantage of their strength, do not run slates of 11 candidates, but, rather, slates of 6 candidates each. Moreover, because a voter who votes for the party, rather than the individual, automatically votes for the person at the *top* of the party list, the party varies the order of candidates on the list from district to district. For example, a party commanding the allegiance of about half the voters, would so make up its list of six that a different person was at the head of the list in districts that each account for about one-sixth of the party's voting strength. This strategy means that a small minority party—free to aggregate its votes across the Commonwealth as a whole—must obtain about eight percent of the vote to elect a representative. The leading minority party (Puerto Rico Independence Party) was not able to obtain more than about five percent of the vote in the last election. Yet, its goal of achieving representation is obviously easier to achieve in the presence of these provisions than in their absence.

Moreover, given the existence of this voting system, it is understandable why the framers of Article III, Section 8 thought that filling a vacancy by party selection would be fairer than requiring a by-election. For one thing, the voting returns show that individual candidates receive enormous number of votes in a few districts and nearly none in others—a fact suggesting that *most voters vote for the party*, giving the candidate vast numbers of votes when he is at the head of the list (and "party" votes count in his favor) and hardly any votes when he is not (and voters must vote separately for him by name).[5] (See

Appendix.) For another thing, how is a by-election to be structured? If it is Commonwealth-wide, many voters (those outside the districts where Tonos Florenzan appeared at the top of the list) will effectively have been given two votes for representative at-large, for the single person they voted for at the general election will also be sitting. Yet, one cannot readily limit the voting to individual Tonos Florenzan districts, for to do so would deprive those few persons outside of those districts who nonetheless voted for him, of a vote for his replacement. To declare a by-election for all 11 seats is obviously unreasonable, for 10 are not vacant. All this helps to explain why the party selection method for filling *interim* vacancies appears reasonable.

In sum, this vacancy-filling system appears to be no less fair or democratic than that found in most states; it is nonetheless tailored to the special concerns and political circumstances of the Commonwealth of Puerto Rico. Certainly, the federal Constitution and the Compact entered into by the Congress with Puerto Rico provide no less autonomy to Puerto Rico than to the states in this regard. See *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); *Fornaris v. Ridge Tool Co.*, 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970); *Cordova & Simonpietri Insurance Agency, Inc. v. Chase Manhattan Bank, N.A.*, 649 F.2d 36 (1st Cir. 1981). While we recognize that plaintiffs have raised a serious argument—an argument weighty enough to lead the Supreme Court to note probable jurisdiction in a related case, see note 1, *supra*,—at this stage, we believe, for the reasons set out, that defendants, not plaintiffs, are likely to prevail on the merits.[6]

---

5.  Mr. Tonos Florenzan received 120,678 votes in the 1980 election and 120,268 of these votes were cast for him in the 21 precincts where he appeared at the top of the PDP ticket. Although he was available to the electors in the rest of the 113 electoral precincts of Puerto Rico, he accumulated only around 400 votes in those other precincts.

6.  Plaintiffs also argue that the selection process violates the Twenty-Sixth Amendment to the Constitution. Article III, Section 8 specifies that the party select its replacement in the same manner in which the former representative was selected. In this case, the former representative was chosen as a "youth delegate" and the successor-selection process, in plaintiffs' view, therefore discriminates against the aged. This issue was not raised below, and

## C

The final factor, "adverse affect upon the public interest," need not be considered at length. We will, however, note two points. First, in most of the cases in which the courts have examined election practices—including those in which it held the practice unconstitutional—they not only refrained from authorizing preliminary injunctions but they have also carefully tailored any final injunctive relief to avoid interfering with work of sitting legislatures, despite the presence of legislators whose selection was unconstitutional under the case then decided. This was true in reapportionment cases—see *Wise v. Lipscomb*, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978)—and others as well—see *Ortiz v. Hernandez Colon*, 385 F.Supp. 111 (D.P.R. 1974) (three judge court) (*see* 511 F.2d 1080 (1st Cir. 1975) and 429 U.S. 1031, 97 S.Ct. 721, 50 L.Ed.2d 742 (1977)). This approach suggests a belief that the public, as a general rule, is likely to suffer less adverse an impact from the presence of an "unconstitutionally selected" legislator than it is from direct judicial intervention into the affairs of an ongoing legislature. Second, the Supreme Court has reached a similar judgment in a case directly related to this one. It has refused to stay, *sub nom. Rodriquez v. Popular Democratic Party*, the mandate of the Supreme Court of Puerto Rico in *Partido Popular Democratico v. Gobernador, supra*, holding that a similar appointing system for district representation is constitutional. At the same time it has decided to hear whether the laws providing for the filling of such *district* (not at-large) vacancies are constitutional. Thus it will be passing upon the constitutionality of provisions similar in some respects to Article III, Section 8 itself. It has specified that while it decides that issue, the representatives chosen to fill the vacancy will sit.[7] In other words, the Supreme Court has reached a similar judgment in a case very similar to this one.[8]

To put the matter differently, we believe the district court should have given somewhat more weight than it did to the desirability of the legislature's functioning and the undesirability except in compelling circumstances of a federal court's intruding through injunctions directly into the Commonwealth's legislative and political processes. *Cf. Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Adams v. Vance*, 570 F.2d 950 (D.C. Cir.1978). The "preliminary injunction" criteria that we have listed are guidelines, not mechanical formulae, and they are no substitute for the careful exercise of a judgment sensitive to all of the interests likely to be affected by an injunction and the suitability of the underlying controversy to judicial resolution. Here there were adequate signs that might have warned a federal judge to approach the request for injunctive relief with caution: The provisions attacked are part of the Constitution of Puerto Rico. The Supreme Court of Puerto Rico, as we have said, had addressed a similar challenge to a similar provision and had upheld its constitutionality. *Partido Popular Democratico v. Gobernador*, 111

---

it played no part in the district judge's deliberations. Indeed, the issue apparently was first raised in a brief filed here the day before argument. Defendants have had no opportunity to consider this lately added ground. Therefore we do not pass upon this question. We note, however, that we do not believe plaintiffs' argument is likely to prove so clearly correct as to warrant issuance of a preliminary injunction. Plaintiffs point to *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) in which the Supreme Court struck down a party primary that involved racial discrimination. Selection of a "youth delegate" does not obviously fit within that case's bounds. Given the issue and far-reaching impact of a decision (presumably applying to party primary election procedures as well) full argument is warranted prior to any judicial change in the status quo.

7. Justice Brennan referred the issue to the full Court. 453 U.S. 907, 101 S.Ct. 3138, 69 L.Ed. 2d 991 (1981).

8. Thus, the injunction at issue here cannot prevent at least one "potentially unconstitutional" representative from sitting—an additional fact that makes the district court's finding of "irreparable harm" in the absence of the injunction surprising.

D.P.R. ——, 81 JTS 41 (1981). The "injury" at issue is to the body politic as a whole; there is no claim of discrimination or real injury to a handful of otherwise unprotected individuals. The "injury" has occurred for many years without previously giving rise to law suits or complaints. The injunction sought interferes directly with the on-going work of the legislature. The Supreme Court of the United States, in a directly-related case, had refused a stay which would have the same effect as the injunction sought here.

Even without these special factors, however, even under the most traditional tests, the preliminary injunction ought not to have issued. *We therefore vacate the order of the district court and remand for proceedings consistent with this opinion.*

*The mandate of this court will issue at the close of business, Tuesday, February 2, 1982.*

## APPENDIX

VOTE FOR CANDIDATES FOR REPRESENTATIVES AT LARGE

POPULAR DEMOCRATIC PARTY

GENERAL ELECTIONS 1980

Page 3 of defendants' App. 7

| PRECINCTS | | RONY JARABO | LUIS MUÑOZ ARJONA | SEVÉRO E. COLBERG | LUIS A. DUPREY | FERNANDO TONOS | JOSE E. ARRARAS |
|---|---|---|---|---|---|---|---|
| San Juan | 1 | 86 | 24 | 43 | 16 | 7 | 8,390 |
| San Juan | 2 | 31 | 8,650 | 39 | 8 | 6 | 51 |
| San Juan | 3 | 10,873 | 25 | 44 | 10 | 6 | 43 |
| San Juan | 4 | 28 | 9 | 27 | 20 | 12,807 | 70 |
| San Juan | 5 | 37 | 11,190 | 36 | 10 | 14 | 50 |
| Guaynabo | 6 | 50 | 11 | 38 | 4,277 | 6 | 43 |
| Guaynabo | 9 | 2 | 2 | 3 | 1,665 | 0 | 1 |
| Bayamón | 7 | 27 | 8 | 33 | 7,490 | 9 | 31 |
| Bayamón | 8 | 36 | 22 | 67 | 16,597 | 13 | 50 |
| Bayamón | 10 | 23 | 5 | 24 | 3 | 5 | 8,124 |
| Bayamón | 16 | 28 | 7,326 | 49 | 7 | 9 | 25 |
| Corozal | 11 | 10 | 7 | 16 | 0 | 7,201 | 15 |
| Naranjito | 12 | 13 | 5 | 5 | 1 | 7,686 | 9 |
| Toa Alta | 13 | 17 | 6,451 | 12 | 4 | 3 | 13 |
| Toa Baja | 14 | 20 | 21 | 24 | 5,545 | 4 | 26 |
| Toa Baja | 18 | 32 | 12 | 47 | 8,246 | 11 | 27 |
| Dorado | 15 | 2,507 | 2 | 5 | 0 | 1 | 7 |
| Dorado | 19 | 4,139 | 5 | 20 | 0 | 1 | 10 |
| Cataño | 17 | 11 | 6 | 14 | 1 | 0 | 4,409 |
| Vega Alta | 20 | 6,822 | 7 | 15 | 4 | 3 | 4 |
| Vega Baja | 21 | 24 | 10,977 | 37 | 7 | 4 | 22 |
| Manatí | 22 | 6 | 1 | 5 | 1 | 2 | 2,811 |
| Manatí | 27 | 14 | 3 | 5 | 0 | 0 | 5,627 |
| Morovis | 23 | 6,039 | 2 | 5 | 2 | 1 | 5 |
| Orocovis | 24 | 8 | 0 | 4,927 | 0 | 6 | 3 |
| Ciales | 25 | 7 | 1 | 0 | 0 | 1 | 4,095 |
| Jayuya | 26 | 3,437 | 0 | 1 | 0 | 1 | 4 |
| Barceloneta | 28 | 7 | 1 | 5 | 0 | 4,880 | 8 |
| Florida | 29 | 1 | 1,787 | 2 | 0 | 0 | 4 |
| Arecibo | 30 | 22 | 5 | 8,186 | 1 | 2 | 17 |
| Arecibo | 31 | 31 | 11 | 12,764 | 3 | 5 | 25 |
| Hatillo | 32 | 7,382 | 0 | 4 | 0 | 1 | 4 |
| Hatillo | 33 | 584 | 0 | 1 | 0 | 0 | 1 |
| Camuy | 34 | 6 | 3 | 9 | 0 | 1 | 6,659 |
| Quebradillas | 35 | 8 | 5 | 10 | 4,961 | 2 | 9 |
| Isabela | 36 | 9,547 | 7 | 10 | 6 | 1 | 11 |
| Aguadilla | 37 | 12,009 | 12 | 25 | 4 | 4 | 25 |
| Moca | 38 | 10 | 4 | 14 | 1 | 0 | 5,055 |
| Moca | 39 | 0 | 0 | 2 | 0 | 0 | 1,766 |

| PRECINCTS | | RONY JARABO | LUIS MUÑOZ ARJONA | SEVÉRO E. COLBERG | LUIS A. DUPREY | FERNANDO TONOS | JOSE E. ARRARAS |
|---|---|---|---|---|---|---|---|
| Aguada | 40 | 6,647 | 7 | 14 | 0 | 0 | 7 |
| Rincón | 41 | 11 | 1 | 4 | 1 | 3,595 | 7 |
| Añasco | 42 | 6,114 | 2 | 8 | 0 | 0 | 6 |
| Mayaguez | 43 | 6 | 3 | 8 | 0 | 2 | 3,120 |
| Mayaguez | 44 | 52 | 16 | 73 | 7 | 4 | 16,067 |
| Mayaguez | 45 | 9 | 5 | 15 | 1 | 0 | 4,149 |
| San Sebastián | 46 | 21 | 7 | 18 | 9,301 | 0 | 10 |
| Las Marías | 47 | 4 | 1 | 3 | 2,524 | 0 | 3 |
| Maricao | 48 | 1 | 1 | 3 | 1 | 0 | 1,740 |
| Hormigueros | 49 | 17 | 3 | 12 | 0 | 3,853 | 7 |
| San Germán | 50 | 3 | 1,140 | 6 | 0 | 0 | 0 |
| San Germán | 51 | 23 | 7,353 | 29 | 1 | 4 | 13 |
| Cabo Rojo | 52 | 12 | 6 | 8,324 | 0 | 4 | 9 |
| Lajas | 53 | 10 | 7 | 5,966 | 4 | 9 | 19 |
| Sabana Grande | 54 | 13 | 5 | 6,829 | 0 | 1 | 15 |
| Guánica | 55 | 20 | 0 | 8 | 1 | 2 | 4,498 |
| Yauco | 56 | 22 | 13 | 9,297 | 21 | 3 | 21 |
| Guayanilla | 57 | 0 | 0 | 1 | 382 | 0 | 1 |
| SUBTOTALS | | 76,919 | 55,177 | 57,191 | 61,134 | 40,179 | 77,241 |

VOTE FOR CANDIDATES FOR REPRESENTATIVES AT LARGE

POPULAR DEMOCRATIC PARTY

GENERAL ELECTIONS 1980—CONTINUED

| PRECINCTS | | RONY JARABO | LUIS MUÑOZ ARJONA | SEVÉRO E. COLBERG | LUIS A. DUPREY | FERNANDO TONOS | JOSE E. ARRARAS |
|---|---|---|---|---|---|---|---|
| Guayanilla | 62 | 20 | 5 | 17 | 4,534 | 2 | 11 |
| Lares | 58 | 9 | 8 | 6,808 | 2 | 4 | 5 |
| Utuado | 59 | 19 | 0 | 8,422 | 1 | 3 | 17 |
| Adjuntas | 60 | 5 | 2 | 0 | 0 | 2,008 | 3 |
| Adjuntas | 61 | 5 | 0 | 0 | 0 | 2,963 | 3 |
| Peñuelas | 63 | 4 | 3 | 5 | 4,665 | 5 | 4 |
| Ponce | 64 | 27 | 9 | 22 | 19 | 7,724 | 19 |
| Ponce | 65 | 11,834 | 13 | 38 | 21 | 6 | 29 |
| Ponce | 66 | 33 | 18 | 12,190 | 14 | 7 | 30 |
| Villalba | 67 | 1 | 3 | 4,610 | 2 | 1 | 11 |
| Juana Díaz | 68 | 14 | 13 | 6 | 18 | 8,891 | 41 |
| Santa Isabel | 69 | 11 | 0 | 6 | 13 | 1 | 3,553 |
| Santa Isabel | 70 | 1 | 0 | 1 | 1 | 0 | 1,095 |
| Coamo | 71 | 16 | 8,152 | 10 | 1 | 4 | 8 |
| Salinas | 72 | 13 | 4 | 10 | 4 | 2 | 6,915 |
| Aibonito | 73 | 10 | 4 | 4,684 | 0 | 1 | 12 |
| Aibonito | 74 | 6 | 0 | 1,360 | 0 | 2 | 4 |
| Barranquitas | 75 | 12 | 1 | 11 | 0 | 5,606 | 8 |
| Comerío | 76 | 4,865 | 3 | 6 | 0 | 3 | 5 |
| Aguas Buenas | 77 | 5,279 | 5 | 6 | 1 | 2 | 6 |
| Cidra | 78 | 3 | 2,807 | 5 | 0 | 0 | 4 |
| Cidra | 79 | 3 | 3,837 | 10 | 1 | 1 | 10 |
| Cayey | 80 | 25 | 4 | 10,497 | 4 | 13 | 37 |
| Guayama | 81 | 7 | 1 | 5 | 2,455 | 1 | 11 |
| Guayama | 82 | 27 | 10 | 39 | 6,060 | 7 | 31 |
| Maunabo | 83 | 3,056 | 0 | 3 | 0 | 1 | 2 |
| Patillas | 84 | 22 | 2 | 4 | 33 | 4,669 | 8 |
| Arroyo | 85 | 9 | 3 | 14 | 3,935 | 2 | 11 |
| Caguas | 86 | 42 | 17,579 | 42 | 16 | 17 | 59 |
| Caguas | 87 | 16 | 8,284 | 18 | 14 | 14 | 20 |
| Juncos | 88 | 7 | 6,608 | 7 | 1 | 2 | 4 |
| Gurabo | 89 | 18 | 5 | 5 | 1 | 6,173 | 14 |
| San Lorenzo | 90 | 7,977 | 6 | 7 | 1 | 8 | 9 |
| Yabucoa | 91 | 27 | 3 | 14 | 1 | 8,442 | 13 |

| PRECINCTS | | RONY JARABO | LUIS MUÑOZ ARJONA | SEVÉRO E. COLBERG | LUIS A. DUPREY | FERNANDO TONOS | JOSE E. ARRARAS |
|---|---|---|---|---|---|---|---|
| Las Piedras | 92 | 4 | 1 | 3 | 3 | 2,877 | 11 |
| Las Piedras | 95 | 3 | 3 | 1 | 1 | 2,994 | 8 |
| Humacao | 93 | 27 | 12,383 | 39 | 11 | 12 | 27 |
| Naguabo | 94 | 25 | 4 | 15 | 1 | 5 | 5,422 |
| Ceiba | 96 | 2 | 1 | 1 | 1 | 0 | 737 |
| Ceiba | 102 | 5 | 1,774 | 4 | 0 | 2 | 5 |
| Río Grande | 97 | 22 | 6 | 12 | 4 | 7,229 | 35 |
| Luquillo | 98 | 8 | 1 | 5 | 1 | 3,454 | 12 |
| Fajardo | 99 | 15 | 8 | 14 | 1 | 6,680 | 32 |
| Culebra | 100 | 376 | 0 | 0 | 0 | 0 | 0 |
| Vieques | 101 | 5 | 2,217 | 4 | 1 | 0 | 5 |
| Canóvanas | 103 | 13 | 7 | 14 | 2 | 7,704 | 22 |
| Loíza | 104 | 6 | 4 | 15 | 2,645 | 1 | 8 |
| Carolina | 105 | 35 | 10 | 56 | 10,760 | 14 | 50 |
| Carolina | 106 | 71 | 31 | 57 | 15 | 9 | 14,102 |
| Carolina | 107 | 7 | 3 | 5 | 0 | 2,832 | 19 |
| Trujillo Alto | 108 | 4,672 | 12 | 18 | 6 | 4 | 36 |
| Trujillo Alto | 110 | 4,356 | 7 | 8 | 3 | 6 | 24 |
| San Juan | 109 | 64 | 17 | 10,783 | 6 | 39 | 65 |
| San Juan | 111 | 55 | 26 | 53 | 10,299 | 27 | 92 |
| San Juan | 112 | 21 | 15 | 19 | 4 | 8 | 6,070 |
| Guaynabo | 113 | 43 | 14 | 63 | 9,065 | 17 | 41 |
| SUBTOTALS | | 43,258 | 63,936 | 60,071 | 54,647 | 80,499 | 38,835 |
| TOTALS | | 120,177 | 119,113 | 117,262 | 115,781 | 120,678 | 116,076 |