Gordon v. HHS                        CV-93-132-B    03/31/94

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Albert E. Gordon

        v.                                      Civil No. 93-132-B

Secretary of Health and Human Services


**O R D E R**


Albert Gordon brings this action pursuant to 42 U.S.C.A. § 405(g) (West Supp. 1993), challenging a final determination by the Secretary of Health and Human Services ("Secretary") denying his application for Social Security disability benefits. Presently before the court are Plaintiff's Motion for Order Reversing the Decision of the Secretary, and Defendant's Motion to Affirm the Secretary's Decision.


**I.   STANDARD OF REVIEW**

Pursuant to 42 U.S.C.A. § 405(g), the court is empowered to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." In reviewing a Social Security decision, the factual findings of the Secretary "shall be conclusive if supported by 'substantial

evidence.'"  Irlanda Ortiz v. Secretary of Health & Human Serv.,
955 F.2d 765, 769 (1st Cir. 1991) (quoting 42 U.S.C. § 405(g)).[1]
Thus the court must "'uphold the Secretary's findings . . . if a
reasonable mind, reviewing the evidence in the record as a whole,
could accept it as adequate to support [the Secretary's]
conclusion.'"  Id. (quoting Rodriguez v. Secretary of Health &
Human Serv., 647 F.2d 218, 222 (1st Cir. 1981)).  Moreover, it is
the Secretary's responsibility to "determine issues of
credibility and to draw inferences from the record evidence," and
"the resolution of conflicts in the evidence is for the
Secretary, not the courts."  Irlanda Ortiz, 955 F.2d at 769
(citing Rodriguez, 647 F.2d at 222).


## II.  BACKGROUND

Gordon was born on June 23, 1942.  He has a ninth grade
education and has received his Graduate Equivalency Degree while
he was in the military.  His job history includes positions in an

---

[1] The Supreme Court has defined 'substantial evidence' as
"such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." Richardson v. Perales, 91 S.
Ct. 1420, 1427 (1971).  "This is something less than the weight
of the evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence."
Consolo v. Federal Maritime Comm'n, 86 S. Ct. 1018, 1026 (1966).

automobile body shop, performing jobs such as straightening, painting, and body work, however, he is not a qualified automobile mechanic. Gordon asks this court to review the findings and determinations of the Secretary, and either remand for further hearing or rule that he is entitled to benefits from January 8, 1991 to date.

A. Medical History

Gordon's medical records indicate that in 1981 he underwent back surgery to treat decompression of a nerve root. Although he recovered completely from this initial surgery, his pain recurred in January 1990 when he was bending over to pick up a garage door. He sought medical treatment from Dr. Hoke Shirley in December 1990 when he again suffered pain while using a sledge hammer at work. His symptoms included lower back pain and associated numbness on the plantar surface of his foot, but he experienced no weakness in his lower extremities. Dr. Shirley's diagnosis was left lumbar radicular syndrome, most likely caused by a prolapsed disk in the L4 - L5 region. Gordon was referred to physical therapy.

In January 1991, Dr. Shirley expressed the view that Gordon needed to discontinue work and start a physical therapy program, which Gordon complied with. In February, Dr. Shirley noted that

3

Gordon's condition had improved only minimally, with tenderness bilaterally in the iliolumbar angles and over the spinuous processes of L3 through L5. Dr. Shirley scheduled an MRI which showed no herniated discs, though it did reveal some scarring and fibrosis at the level L5-S1 without clear radicular encroachment. He referred Gordon to Dr. David J. Nagel to perform EMG/NCV studies.

Gordon saw Dr. Nagel in April 1991, for electrophysiologic studies. After performing the necessary tests, Dr. Nagel concluded that the results were consistent with a diagnosis of a left S1 radiculopathy.

Gordon saw Dr. Shirley again in April 1991, where he noted that Gordon's condition was continuing to decline. Gordon was exhibiting pain down the back of his right leg which inhibited his ability to continue with physical therapy. Dr. Shirley prescribed a steroid injection through Dr. Beasley and a continued physical therapy program.

Gordon was referred to Dr. Scala and Dr. Sachs in May 1991, who performed various physical tests. Gordon had a symmetric gait, and was able to toe and heel walk without problem, but was only able to bring his finger tips to the level of his knees bending forward. Gordon had normal range of motion for shoulder

4

twisting, trunk twisting, and side bending, and showed good range of motion of all joints in both lower extremities. Dr. Sachs diagnosed Gordon as having: 1) a failed previous lumbar spine laminectomy discectomy syndrome with persistent pain, 2) a prolapsed lumbar disc which could be a discogenic lumbar radicular pain syndrome, 3) some remnants of internal disc derangement and disruption particularly at L5-S1 which would correspond to his previous surgery, 4) a weight problem. He recommended further evaluation through a lumbar discography to find out which disc was causing the problem, and further physical therapy and nutritional consultation. He also prescribed Feldene, a non-steroid anti-inflammatory drug.

The results of Gordon's discogram were very nonspecific and did not reveal the pathologic source of Gordon's pain. Dr. Sachs noted that Gordon was "wavering and facilitating" in his responses and could not say what was causing his pain. He noted some abnormal discs but did not feel that there was a specific area that could be addressed with surgical intervention or further testing. He reiterated the previous 4-part diagnosis and discharged Gordon from his care stating that he could offer no further treatment or diagnoses.

Gordon returned to Dr. Nagel in August 1991, complaining of

stabbing, aching pain across the back that extended down both legs as far as the knee. This pain also resulted in tingling in Gordon's left foot. Gordon asserted that the pain was exacerbated by lifting or prolonged walking, and that it kept him awake at night. Dr. Nagel opined that Gordon had multilevel disc disease at L2-3, L3-4, L4-5 and L5-S1, which was consistent with an S1 radiculopathy. He recommended that Gordon begin swim therapy to improve his conditioning and flexibility and that he get vocational counseling. He also recommended a diagnostic nerve block of the L5-S1 nerve root to determine Gordon's pain generator.

Gordon's condition continued with the same symptoms through September 1991. At that time Dr. Nagel noted that Gordon had been diagnosed as being able to return to work by Dr. Sachs, with limitations of 6 hours per day at a sedentary to light level job, not lifting more than 20 pounds, not sitting for more than 30 minutes, and not carrying more than 20 pounds. He opined that if Gordon did not respond to cortisone injections these restrictions would be a permanent limitation.

Gordon reported increasing pain in November 1991, after a doctor forcibly twisted him while he was in a flexed position. Dr. Nagel increased Gordon's pain medication and recommended

6

setting up an appointment with Dr. Beasley, which Gordon did.  In December, 1991 Gordon continued to experience residual increased pain from the procedure in November, but was seeking help from Dr. Beasley and taking Tylenol #4, twice daily.  Dr. Nagel opined that Gordon as capable of sedentary work at best at about 4 hours a day at that time.

In January 1992, Gordon's pain continued despite his consultation with Dr. Beasley.  His medication included Tylenol #2 twice daily, Elavil and Valium.  Dr. Nagel noted that his physical exam remained unchanged, but he found Gordon totally disabled based on his pain complaints and the fact that he found Gordon to be significantly more dysfunctional than when he had evaluated him as being able to return to part time sedentary work.

Gordon's pain complaints remained consistent through February and March 1992, as did the results of physical examinations.  Gordon asked for a referral for a second opinion regarding surgery as an option, and was referred to Dr. Leon Grobler at the Spine Institute of New England.  Dr. Grobler reviewed Gordon's previous test results and performed various physical exams.  Dr. Grobler found Gordon's case frustrating and confusing.  He did not recommend surgery because he could find no

7

definitive nerve compression or tension signs. He expressed the view that he would support any functional rehabilitation program that Dr. Nagel would recommend for Gordon.

Gordon returned to Dr. Beasley in May 1992, complaining of lower back pain that traveled down into both legs. Dr. Beasley reviewed Gordon's previous test results and discussed the possibility of epidurolysis of adhesions in an attempt to get rid of his leg pain or the possibility of a spinal cord stimulator or back brace to relieve his pain. Dr. Beasley eventually scheduled Gordon for cryoprobe of the facet joint on the left side.

Dr. Beasley performed the cryoprobe in July, and it provided relief to Gordon in his back and both legs. This reduction was only temporary, however, as Gordon returned to Dr. Nagel in late July complaining of increased pain since the procedure. Dr. Nagel stated that he was completely out of ideas to help Gordon since he clearly had pain syndrome along with multiple levels of spinal abnormalities. He wrote that he had been unable to find the specific source of Gordon's pain.

Gordon saw Dr. Beasley again in August, and Dr. Beasley recommended that either an epidural lysis of adhesions or spinal cord stimulation be attempted. Gordon returned to Dr. Nagel in September, who outlined four possible treatment options. These

included: 1) a continued physical therapy program using an independent membership at the racquet club, 2) an epiduralysis of adhesions if the physical restoration program did not help, 3) use of a spinal cord stimulator if the treatments suggested in 1) and 2) did not work, and 4) in-patient pain management program. Dr. Nagel opined that at that time Gordon continued to remain disabled from work. Gordon subsequently obtained a membership at the racquet club in accordance with the doctor's first recommendation.

B. Procedural History

Gordon filed an application for disability insurance benefits on or about December 31, 1991. The claim was denied on January 30, 1992, as was his request for reconsideration. Gordon then requested and received a hearing before an Administrative Law Judge (ALJ) on November 4, 1992. The ALJ found that:

1. The claimant met the disability insured status requirements of the Act on January 8, 1991, the date the claimant stated he became unable to work, and continues to meet them through December 31, 1995.

2. The claimant has not engaged in substantial gainful activity since January 8, 1991.

3. The medical evidence establishes that the claimant has severe low back pain, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

9

4. The claimant's testimony regarding subjective complaints of pain was not entirely credible because his allegations were inconsistent with his daily activities, his failure to follow through with treatment recommendations, the nature of his condition, his response to treatment that was provided and a possibility of secondary gain.

5. The claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for lifting over 20 pounds occasionally and 10 pounds frequently, and sitting for longer than 30 minutes at a time and work for longer than six hours at a time (20 CFR 404.1545).

6. The claimant is unable to perform his past relevant work as an autobody mechanic.

7. The claimant's residual functional capacity for the full range of light work is reduced by his inability to work for longer than six hours at a time and his inability to sit for longer than 30 minutes at a time.

8. The claimant is 48 years old, which is defined as a younger individual (20 CFR 404.1563).

9. The claimant has a ninth grade limited education (20 CFR 404.1564).

10. The claimant does have work skills which he acquired in his past relevant skilled work activity as an autobody mechanic (20 CFR 404.1568).

11. Based on an exertional capacity for light work, and the claimant's age, education, and work experience, Section 404.1569 and Rule 202.18, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

12. Although the claimant's additional nonexertional limitations do not allow him to perform the full range of light work, using the above-cited rule as a framework for decisionmaking, there are a significant number of jobs in the national economy which he could perform. Examples of

such jobs are: an unarmed security guard with 2,000 jobs in New Hampshire and 573,000 in the nation.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f)).

A request for review made to the Appeals Council was denied on February 4, 1993. Gordon filed the instant appeal on or about March 17, 1993.

## II. DISCUSSION

Gordon challenges the ALJ's decision on two grounds: (1) that the ALJ erroneously concluded that Gordon's spinal cord disorder failed to meet or equal an impairment listed at 20 C.F.R. Pt. 404, Subpart P, Appendix 1; and (2) that the ALJ's "no disability" determination at Step 5 was not supported by substantial evidence because the ALJ improperly discounted Gordon's subjective complaints and erroneously found that Gordon was capable of a limited range of light work that existed in significant numbers in the national economy. I address these arguments seriatim.

### A. Failure to Meet or Equal a Listed Impairment

A claimant will be found disabled at Step Three in the sequential evaluation process if her or she has "an impairment(s) which is ... listed in Appendix 1 or is equal to a listed

11

impairment(s)...."  20 C.F.R. § 1520(d).  Gordon argues that his spinal impairment meets or equals those set out in § 1.05(C) of the Listings.  Section 1.05(C) states, in pertinent part,

> [o]ther vertebrogenic disorders (e.g., herniated nucleus puplosus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months.  With both 1 and 2:
>
> 1.  Pain, muscle spasm, and significant limitation of motion in the spine; and
>
> 2.  Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

To meet a spinal impairment listed in §1.05(C), Gordon must be diagnosed as having a vertebrogenic disorder and have the findings shown in 1 and 2 above.  20 C.F.R. § 404.1525(d).  To equal a listed spinal impairment, Gordon's impairment must at least equal the listed impairment's severity and duration.  20 C.F.R. § 404.1526(a).  Both types of determinations must be based on medical evidence supported by medically accepted clinical and diagnostic techniques.  Id. at (b); § 404.1525(c).  The ALJ may also consider the medical opinion of a qualified consultant designated by the Secretary.  § 404.1526(b).

Gordon lists a wide variety of objective medical evidence to support his argument that his spinal condition meets or equals

12

those listed in §1.05(C).[2]  Nowhere amongst the list he proffers, however, is there any evidence indicating that his disorder causes "appropriate distribution of significant motor loss" or the equivalent.  See §1.05(C)(2).  To the contrary, the record contains several references which indicate that, while Gordon's impairment does restrict his ability to bend at the waist, his motor function is "4/5" or "5/5".  Finally, while Dr. Nagel opined that Gordon was "totally disabled", the Secretary's medical consultants, Drs. Nault and Rainie, are apparently the only physicians to have opined on the Listings issue.  They have concluded that Gordon's impairment is not of a "Listings level severity."   See Dudley v. Secretary of Health & Human Services, 816 F.2d 792, 793 (1st Cir. 1987) (ALJ can credit non-treating sources, even in face of contrary evidence from treating sources).  Given the above, the ALJ's decision that Gordon's impairment does not meet or equal a spinal disorder listed in §1.05(C) is supported by substantial evidence.

---

[2]I assume, arguendo, that Gordon's diagnosed impairment is severe enough to qualify as a "vertebrogenic disorder" for listing purposes.  I note, however, that this conclusion is by no means clear.  While medical examinations have revealed scarring and fibrosis at his L5-S1 disc, these examinations also indicate that there is no disc herniation or radicular encroachment.

13

**B.    The ALJ's Step Five Determination**

At Step Five in the sequential evaluation process, the Secretary has the burden of showing that, despite the severity of claimant's impairment and inability to return to past relevant work, he or she retains the residual functional capacity to perform other occupations that exists in significant numbers in the national economy and region where the claimant lives. See 20 C.F.R. §404.1520(f); Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991). Gordon argues that the ALJ erred in making a "no disability" determination here because (1) the ALJ improperly discounted Gordon's subjective complaints and thus overestimated his residual functional capacity ("RFC"), and (2) the ALJ erroneously concluded that Gordon's resultant RFC allowed him to perform part-time light work that existed in significant numbers in the national and New England economies. I address each of these arguments, and their subparts, in turn.

**1.    Subjective Complaints**

Gordon argues that the ALJ improperly discounted his subjective complaints. More specifically, Gordon argues that his testimony regarding his functional limitations are consistent with his claims of severe back and leg pain; that the ALJ

14

erroneously concluded that Gordon did not follow the treatment recommended by his doctors; and that the ALJ misapplied the Avery standard for assessing subjective pain complaints.

a) **Gordon's Testimony Regarding His Functional Limitations**

Gordon essentially argues that the ALJ improperly discounted his testimony at the hearing regarding his functional limitations. At the hearing, Gordon testified, inter alia, that he can only sit for 15-30 minutes at a time, can only stand for two or three minutes, cannot walk more than twenty-five yards without his feet going numb, stairs cause him difficulty, he can only lift five to ten pounds at once, he cannot do household chores, he does not sleep well and he cannot coach baseball or put on his own socks. However, noting evidence from Gordon's disability application and portions of his testimony which indicate that Gordon was not as limited as he claims, the ALJ determined that Gordon's self-described limitations were somewhat exaggerated. Given that a "credibility determination by the ALJ, who observed the claimant, evaluated his [or her] demeanor, and considered how that testimony fit in with the rest of evidence, is entitled to deference, especially when supported by specific findings," Frustaglia v. Secretary of Health and Human Services., 829 F.2d 192, 195 (1st Cir. 1987), I see no reason to question

15

the ALJ's discounting of Gordon's self-described limitations here.

**b)    Failure to Follow Recommended Treatment**

Gordon next argues that the ALJ incorrectly found that Gordon did not follow through with his physicians' treatment recommendations.  I disagree.

By pointing to evidence that he actually complied with all treatments required by his physicians, Gordon misconstrues the import of the ALJ's finding with respect to Gordon's failure to "follow through" with these treatments.  The ALJ did not find that Gordon refused to comply with prescribed treatments or ignored his doctors' suggestions.  Instead, based on substantial evidence, he found that Gordon's failure to pursue other available avenues of treatment, or to act on doctors' recommendations without numerous promptings and reminders, indicated that Gordon's pain was not as severe as he claimed.  In other words, as the ALJ stated, "[i]f the claimant's pain were so severe as to interfere with all work activity, then he would have been seeking out all forms of medical treatment and examination" as quickly as possible.  The record amply supports this conclusion.  Thus, while the ALJ's use of the phrase "failed to follow through" was not the clearest means of conveying his

16

finding in this regard, the conclusion he attempts to convey is reasonable.

c)    **Subjective Pain Complaints**

Finally, Gordon argues that the ALJ misapplied the Avery standard because he discounted Gordon's pain complaints solely on the grounds that "the objective medical evidence does not establish a severe condition beyond a possible L5 radiculopathy." He contends that the objective medical findings -- scarring, fibrosis, muscle spasms, limited range of motion and other evidence -- establish a severe condition that could reasonably be expected to produce the pain he suffers.  Consequently, Gordon concludes that the ALJ erred in failing to rely on the fact that he takes pain medication, as well as to his own testimony regarding the intensity of his pain and its effect on his functional abilities, to find him disabled.

This argument fails for two reasons.  First, given several doctors' failure to identify the source of Gordon's pain, there is ample evidence in the record to support the ALJ's conclusion that the severity of Gordon's pain complaints are not supported by objective medical findings.  See Dupuis v. Secretary of Health and Human Services, 869 F.2d 622, 623 (1st Cir. 1989) (although pain complaints need not be "precisely corroborated" by medical

17

findings, the complaints must be "consistent with medical findings").  Second, the ALJ correctly applied <u>Avery</u>, evaluating Gordon's pain complaints not only in light of the medical evidence, but in relation to his activity level, functional abilities, lack of urgency in pursuing treatment and his potential secondary gain by overstating his symptoms (e.g., Gordon has filed a worker's compensation claim relating to the same injury).  <u>See</u> <u>Avery v. Secretary of Health and Human Services</u>, 797 F.2d 19, 23 (1st Cir. 1986).  The ALJ also reasonably discredited Gordon's self-described limitations.  <u>See</u> Section II.B.1(b) <u>supra</u>.  Given these factors, the ALJ's discounting of Gordon's subjective pain complaints is supported by substantial evidence.

### 2.  <u>Residual Functional Capacity to Perform Part-time Light Work</u>

Gordon argues that the ALJ erred in concluding (1) that Gordon had the RFC to perform light work for up to six hours per day; (2) that the ALJ improperly applied the "Grid" to determine that Gordon was not disabled; and (3) that the ALJ erroneously determined that significant jobs exist in the national and regional economy for individuals of Gordon's age, educational achievement, skill level and residual functional capacity.

18

**a)    Residual Functional Capacity for Light Work**

20 C.F.R. § 404.1567(b) defines light work as involving

> lifting no more than 20 pounds at a time with frequent
> lifting of carrying of objects weighing up to 10
> pounds.  Even though the weight lifted may be very
> little, a job is in this category when it requires a
> good deal of walking or standing, or when it involves
> sitting most of the time with some pushing and pulling
> of arm or leg controls.

Based on a letter summarizing a report by Dr. Nagel, as well as on Gordon's self-described limitations and subjective pain complaints, the ALJ determined that Gordon could perform such work for up to six hours a day.  Gordon argues that this determination is not supported by substantial evidence because subsequent to the report on which the ALJ relies, Dr. Nagel determined that Gordon was only capable of working four hours a day, and later that Gordon was "totally disabled."  I disagree.

In his opinion, the ALJ explicitly noted Dr. Nagel's finding of "total disability;" however, by adopting Dr. Nagel's earlier conclusion that Gordon could perform light work for up to six hours a day, the ALJ implicitly rejected Nagel's revised opinion. See 20 C.F.R. § 404.1527(e)(1)-(2) (ALJ does not have to accept treating source's opinion as to ultimate legal conclusion). Several portions of the ALJ's opinion indicate that he declined to adopt Nagel's conclusion because it was primarily based on

19

Gordon's subjective complaints of increased pain. The ALJ reasonably rejected these subjective complaints, stating that they were not accompanied by a deteriorating objective medical condition, and were not entitled to their full weight under Avery. Finally, the Secretary's two medical consultants concluded that Gordon had the RFC to perform light work for up to six hours per day. Although the ALJ did not cite to the consultants' assessments, they were in the record and it is reasonable to presume that they informed the ALJ's conclusion. Given all of the above factors, the ALJ's determination that Gordon could perform part-time light work was supported by substantial evidence.

### b) Improper Use of Grid

Gordon argues that the ALJ inappropriately applied the "Grid", 20 C.F.R. Part 404, Subpart P, App. 2, to determine what jobs, if any, he could perform. Gordon argues that, because the ALJ did not consider either Dr. Nagel's more recent reports indicating that Gordon was totally disabled or Gordon's subjective pain complaints (a non-exertional factor), his application of the Grid was incorrect. I disagree.

The ALJ did account for both Dr. Nagel's revised opinions and Gordon's pain complaints; see Section II.B.1. & 2(a); he just

20

did not accord them the weight to which Gordon feels they are entitled. In other words, he determined that Gordon did not experience pain such that he would be precluded from performing light work for up to six hours per day. While mechanical use of the grid is inappropriate in cases where a claimant only retains the functional capacity to perform part-time work, see Lebron v. Secretary of Health and Human Services, 593 F. Supp. 34, 38-39 (D.P.R. 1984), here the ALJ merely used it as a "framework for decision-making." The ALJ factored Gordon's non-exertional limitations into the decision-making process by incorporating these limitations into the hypotheticals he posed to the vocational expert. The expert then considered these limitations, and concluded that there remained significant work in the national and New England economies that Gordon could perform on a part-time basis. Given that the ALJ ensured that Gordon's non-exertional limitations were accounted for, he did not err in using the Grid as an aid in his decision-making process. See id. at 38-39; Ortiz v. Secretary of Health and Human Services, 890 F.2d 520, 524 (1st Cir. 1989) (per curiam).

c)    **Finding Regarding Number of Jobs in National Economy**

Gordon's final argument is that the ALJ incorrectly found that there were significant numbers of part-time security guard

21

positions in New Hampshire which Gordon retained the residual functional capacity to perform.  More specifically, Gordon argues that "there was no evidence that [he] would probably be hired for such jobs" given his abilities;  that the Dictionary of Occupational Titles defines "Security Services" as requiring the ability to react "quickly" and to keep physically fit, both requirements beyond his present capabilities; see U.S. Dept. of Labor, Selected Occupational Characteristics of Occupations Defined in Dictionary of Occupational Titles 39 (1981); and that there is no evidence that Gordon could earn enough money as a part-time security guard to constitute substantial gainful activity.

Each of these arguments are without merit.  First, a claimant is not eligible for disability benefits if his "impairment does not disable him but only makes him less employable because he is less attractive to employers."  Sitar v. Schweiker, 671 F.2d 19, 21 (1st Cir. 1982).  Second, while the Dictionary of Occupational Titles contains job descriptions which can assist an ALJ in determining a claimant's employability, the definition of "Security Services" which Gordon relies upon[3]

---

[3]Security Services is defined as

22

describes a general field of employment rather than the requirements of any specific security position, such as the part-time <u>unarmed</u> security guard position that the vocational expert testified that Gordon could perform. Otherwise, for example, all unarmed security guards would have to be able to "us[e] weapons ... skillfully." As a result, the vocational expert's testimony did not contradict the Dictionary of Occupational Titles. <u>Cf.</u> <u>Mimms v. Heckler</u>, 750 F.2d 180, 186 (2d Cir. 1984). Finally, this Circuit has indicated that part-time work can constitute substantial gainful activity. <u>See</u> <u>Arocho v. Secretary of Health and Human Services</u>, 670 F.2d 374, 376 (1st Cir. 1982); 20 C.F.R. § 404.1572 ("work may be substantial even done on a part-time basis"). The ability to perform six hours of work per day, or thirty hours per week, is enough for the ALJ to conclude that he

> Occupations in this group are concerned with protecting people, animals, and physical property from injury, danger, theft and vandalism. Skills and abilities required include: Learning and knowing laws, safety rules, and procedures; recognizing violations and signs of danger; using reason and judgment to deal with people in different kinds of situations; thinking clearly, staying calm, and reacting quickly in emergencies; using weapons and safety equipment skillfully, keeping physically fit; and making onspot decisions.

<u>Selected Occupational Characteristics</u>, at 39.

23

is not disabled.  See <u>Burkhalter v. Schweiker</u>, 711 F.2d 841 (8th Cir. 1983) (five hours of work per day, five days a week, is substantial gainful activity).

## III.  <u>CONCLUSION</u>

For the foregoing reasons, I grant the Secretary's motion (document no. 8) and affirm her decision denying Gordon disability benefits.  Gordon's Motion for Order Reversing the Secretary (document no. 7) is denied.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

March 31, 1994

cc:  Leslie Nixon, Esq.
     Patrick Walsh, Esq.